DEBRA HORTA *vs*. CHARLES B. SULLIVAN & others.[1]

Suffolk. May 4, 1994. - August 18, 1994.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Negligence*, Municipality, Police. *Police*, Municipality's liability, Negligence. *Municipal Corporations*, Liability for tort. *Massachusetts Tort Claims Act. Governmental Immunity.*

The discretionary decisions of a police officer to begin and continue a high speed pursuit of a motor vehicle then being operated in violation of the law do not involve policy making or planning for purposes of immunity from liability under the discretionary function exception to the Massachusetts Tort Claims Act, G. L. c. 258, § 10 (*b*). [619-622]

CERTIFICATION of a question of law to the Supreme Judicial Court by the United States Court of Appeals for the First Circuit.

*Sheila M. Tierney* for the plaintiff.

*James F. Gettens* for town of Lakeville.

*Scott Harshbarger*, Attorney General, *John E. Bowen & William A. Daggett*, Assistant Attorneys General, for the Commonwealth, amicus curiae, submitted a brief.

LIACOS, C.J. This case presents a question certified to this court by the United States Court of Appeals for the First Circuit,[2] see S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981): "Do the discretionary decisions of a police officer to begin and continue the high speed pursuit of a vehicle then being operated in violation of law involve policymaking or planning for purposes of immunity under Massachusetts

---

[1]Jeffrey Meninno, Paul G. Sadeck, Edward Mello, James K. Bowles, the town of Freetown, and the town of Lakeville.

[2]We acknowledge the assistance provided by the amicus brief filed on behalf of the Commonwealth by the Attorney General.

General Law ch. 258, § 10 (b)?" We answer the question, "No."

We quote the facts as stated in the opinion of the First Circuit, *Horta* v. *Sullivan,* 4 F.3d 2, 5-7 (1st Cir. 1993):

> "On Friday, August 5, 1988, at approximately 9:18 p.m., appellee Jeffrey Meninno, a Lakeville Police Officer, was traveling in his police cruiser north on County Road in Lakeville, Massachusetts, when he observed a motorcycle approaching him in the southbound lane in excess of the posted speed limit.[3] Officer Meninno activated the cruiser's blue lights as the motorcycle approached. He then turned his cruiser around and began to pursue the motorcycle. Instead of pulling over, the motorcycle accelerated.

> "When appellant Debra Horta, riding on the back of the motorcycle, realized that the police car was following them, she told the motorcycle operator, James F. Demoranville, to stop because 'it isn't worth it.' Demoranville refused. 'He just said to tuck my head in between his shoulders and hang on.' [Horta] remembers nothing about what occurred after that moment.

> "Officer Meninno accelerated to keep up and followed the motorcycle along County Road from a distance of a few hundred feet, backing off a number of times when it appeared that the bike was wobbling and the riders might fall off. The chase reached speeds of seventy-five to eighty miles per hour, as Meninno watched the motorcycle drive erratically, pass at least one car, and swerve into and drive in the opposite lane.

---

[3]"Officer Meninno stated that his radar gun, which he was operating as he drove along County Road, measured the motorcycle's speed as 59 miles per hour. The posted speed limit on County Road was 40 miles per hour. A photograph of the radar gun, showing a reading of 59 miles per hour, was attached as an exhibit to Meninno's deposition."

Meninno unsuccessfully attempted to record the motor-cycle's license plate number.

"As the pursuit continued on County Road, Officer Meninno radioed a report to the Lakeville police dispatcher, telling her of the pursuit and asking her to notify the police department in the neighboring town of Freetown that the motorcycle was heading toward the Lakeville-Freetown line. Appellee Charles B. Sullivan, a police officer in Freetown, heard Meninno's transmission but did not yet contact Lakeville. At that time Sullivan and appellee Paul G. Sadeck, another Freetown police officer, were parked in separate cruisers on Route 18 in Freetown. Sullivan told Sadeck about the chase and then drove south on Route 18 toward the intersection of Route 18 and Mason Road. Mason Road runs between County Road and Route 18. Meninno contacted the Lakeville dispatcher again, notifying her that the motorcycle had left Lakeville and entered Freetown. Sullivan then informed the Lakeville dispatcher and Meninno that the Freetown police would assist.

"The motorcycle slowed down to thirty miles per hour, with Meninno doing the same, before turning left from County Road onto Mason Road and accelerating again to over sixty miles per hour.[4] Officer Meninno kept up and told Sullivan by radio that he and the motorcycle were now proceeding eastbound on Mason Road. He also warned Sullivan that, 'He's driving recklessly. Be careful.' Sullivan informed Meninno that he was now coming in the other direction on Mason Road, getting closer to Meninno and the speeding motorcycle.

4"Mason Road is a paved, two-lane road approximately 24 feet wide with a double solid yellow line separating the lanes and a posted speed limit of 30 miles per hour. The segments of County Road and Mason Road on which the pursuit took place are sparsely populated residential and undeveloped areas. That evening, Mason Road was dry and traffic was light."

As the motorcycle and Meninno continued east on Mason Road, Officer Sullivan stopped his police cruiser in the eastbound lane of the two-lane road, facing west. He left the transmission in Drive and 'stood on the brakes' to keep the cruiser stationary. The westbound lane directly next to Sullivan's cruiser was unobstructed.[5] In front of the cruiser, the road ran straight for approximately 480 feet before it turned. Sullivan could not see around the bend to the approaching motorcycle and police car, nor could the latter yet see his car. Sullivan illuminated the cruiser's blue lights, take-down lights,[6] and headlights. No streetlight illuminated the point at which the cruiser was parked, but the road was lit at the bend and the take-down lights illuminated part of the road in front of the cruiser.

"Officer Meninno and the motorcycle were traveling along Mason Road at sixty or sixty-five miles per hour when Officer Sullivan advised Meninno by radio of his precise location, warned him to 'back off' and that he had the road 'blocked.' Meninno says that he did slow down but the motorcycle continued on apace.

"Fifteen to twenty seconds elapsed before Sullivan saw the motorcycle, with Demoranville and [Horta] on it, round the bend in Mason Road with Meninno's cruiser some distance behind it.[7] Demoranville, still driving in the eastbound lane, appeared to slow the cy-

---

[5]"Officer Sadeck, in another cruiser, was heading for Mason Road at this time but did not arrive on the scene until after the crash. . . ."

[6]"Take-down lights are small white lights affixed to the roof of the police cruiser and located in between two sets of flashing blue lights. The take-down lights on Officer Sullivan's cruiser were directed toward the front of the cruiser and illuminated a portion of the area in front of the car."

[7]"Meninno stated in his deposition that he was approximately 250 feet behind the motorcycle when he rounded the turn. Sullivan estimated only that the distance was 'no less than' 50 to 75 feet. The evidence is unclear as to how fast the motorcycle was going when it rounded the last bend on Mason Road."

cle down and steer toward the roadside on his right. However, he apparently lost control of the motorcycle, which fell on its side and slid along the roadway until it collided with the front of Officer Sullivan's stationary police cruiser. The cruiser rose up in the air on impact, Demoranville became wedged underneath the car, and . . . Horta fell backwards off the motorcycle. Meninno eventually stopped without skidding or taking evasive action. Demoranville died within the hour and Horta sustained serious, permanent injuries, resulting in a month-long coma and eventual amputation of her left leg.

"Three to four minutes elapsed from the time Officer Meninno began the pursuit to the time the motorcycle collided with Sullivan's cruiser. The pursuit covered 3.2 miles. At no time did Officer Meninno's police cruiser make physical contact with the motorcycle or its passengers.[8]"

Relevant to the question before us, the Court of Appeals noted that Lakeville had "adopted guidelines that allow Lakeville police officers to conduct and participate in high speed pursuits when, in their judgment, the benefit of apprehension outweighs the risk to public safety," and that Meninno was "[a]cting within the discretion conferred by the guidelines [when he] decided that the best way to fulfill his duty to enforce the law here was to pursue a violator who had refused to obey his signal to pull over." *Id.* at 19.

The question certified to us concerns the potential liability of the town of Lakeville (town) for the conduct of Officer Meninno under G. L. c. 258 (1992 ed.).[9] The town argued that it was shielded from liability by the so-called discretionary function exception to the Massachusetts Tort Claims Act, G. L. c. 258, § 10 (*b*). That section excepts from liabil-

---

[8]"It is undisputed that no non-police vehicles or pedestrians were on Mason Road near the accident scene at the time of the collision."

[9]The issue whether Meninno was negligent is not before us.

ity under the act "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." See *Rinkaus* v. *Carver, ante* 573 (1994).

In its opinion, the United States Court of Appeals for the First Circuit considered at length our decision in *Harry Stoller & Co.* v. *Lowell,* 412 Mass. 139 (1992), and found itself unable to conclude whether, as a matter of Massachusetts law, the discretion which Officer Meninno had regarding whether to begin and to continue the chase is the sort of discretion which involved policy making or planning. *Horta* v. *Sullivan,* 4 F.3d at 22-23.[10] If the discretionary conduct did involve policy making or planning, then § 10 (*b*) would confer immunity. *Stoller, supra* at 142.

Determining whether certain discretionary conduct involves policy making or planning is not a simple task. "Because each case depends on its facts, the design of a comprehensive, all-purpose guide to the limits of the exception is not likely." *Id.* at 143, citing *United States* v. *Varig Airlines,* 467 U.S. 797, 813 (1984). In *Whitney* v. *Worcester,* 373 Mass. 208 (1977) (which preceded but anticipated enactment of the Massachusetts Tort Claims Act), we identified certain considerations as potentially helpful in defining discretionary functions. If the injury-producing conduct was an integral part of governmental policy making or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the case could not be decided without usurping the power and responsibility of either the legislative or executive branch of government, governmental immunity would probably attach. *Whitney, supra* at 219. *Stoller, supra* at 142.

---

[10]The court made a preliminary determination (which we accept) that Meninno had discretion as to what course of conduct to follow, *Horta* v. *Sullivan,* 4 F.3d 2, 17-18 (1st Cir. 1993), which is the first part of the two-part inquiry we described in *Harry Stoller & Co.* v. *Lowell,* 412 Mass. 139, 141 (1992).

Considering these factors, the court concluded that "it can be forcefully contended that Meninno's decisions were of the type based on policy considerations. Clearly, the Commonwealth has a policy for enforcement of the laws by constables and police officers." *Horta* v. *Sullivan*, 4 F.3d at 19. It is this conclusion that appears to cause difficulty and ultimately leaves the court unable to resolve the question whether Meninno's discretion was the sort to which § 10 (*b*) applies.[11] The question whether a governmental actor's conduct involves discretion of the planning or policy-making type must be narrowly focused on the allegedly negligent conduct, not on whether the actor's conduct is part of some broader governmental policy.[12] Here, the question is: "In making his decision to commence and continue the chase, did Meninno's discretion involve taking into account considerations of governmental policy or planning, or, did he make an ad hoc decision, based on the situation confronting him and not broader law enforcement objectives?" Put this way, it is not difficult to conclude that, like the discretion of the firefighters in *Stoller*, the discretion of Officer Meninno is not the sort of discretion that § 10 (*b*) immunizes. *Stoller*, *supra* at 145-146.[13] His exercise of discretion involved no social, political, or economic policy considerations but related simply to

---

[11]Having reached the conclusion that Meninno's discretion involved "policy," the court went on to consider the facts and outcome of *Stoller*, and stated that it was "hard to differentiate between the firefighers' conduct in *Stoller* and the allegedly negligent decision to pursue of Officer Meninno." *Horta* v. *Sullivan*, 4 F.3d at 22-23. Because, in *Stoller*, we concluded that the firefighters' decision not to use a building's sprinkler system in combatting a fire did not involve policy or planning, and therefore, that the discretionary function exception did not apply, the Federal court was unable to reconcile this result with its earlier conclusion that Meninno's decision involved "policy."

[12]Indeed, we can presume that all governmental employees, in their official duties, act in furtherance of some governmental policy.

[13]This court has issued decisions in other cases concerning § 10 (*b*) since the Federal court certified this question to us. Each reaffirms the basic principles expressed in *Stoller*, and points toward answering the certified question "No." For example, in *Rinkaus* v. *Carver*, *ante* 573 (1994), we held that a town's failure to respond to a perceived traffic and safety

whether to initiate the pursuit and whether to terminate it. Such decisions have no close nexus to policy making or planning and do not "involve" it. *Stoller, supra* at 141. "Almost all conduct involves some discretion, if only concerning minor details. If allegedly tortious conduct were to be immunized from causing liability simply because there was some element of discretion in that conduct, the discretionary function exemption would go a long way toward restoring the governmental immunity that G. L. c. 258 was designed to eliminate." *Id.*

Because Meninno's discretion in commencing and continuing the high-speed pursuit of the motorcycle did not involve policy making or planning, we answer the certified question, "No."[14]

---

problem was a protected discretionary function because it involved the distribution of resources, and hence "planning."

We held in *Sena* v. *Commonwealth*, 417 Mass. 250 (1994), that "decisions of law enforcement officers regarding whether, when, how, and whom to investigate, and whether and when to seek warrants for arrest are based on consideration of, and necessarily affect, public policy," *id.* at 256, and thus, were protected by § 10 (*b*). No similar considerations of public policy were present here.

[14]The court noted, 4 F.3d at 24, that, "[i]f the question is answered in the negative, then summary judgment was improper and the claim will be remanded to the district court for further proceedings." As that court and the parties undoubtedly know, the Legislature has amended the Massachusetts Tort Claims Act, G. L. c. 258, in the time since this question was certified to us. See St. 1993, c. 495, §§ 57 and 144. Because the issue is not before us, we do not speculate on how these amendments may affect Horta's claims, if at all.