## Commonwealth *vs.* Timothy L. Braley.

Plymouth. February 9, 2007. - June 12, 2007.

Present: Marshall, C.J., Ireland, Spina, Cowin, & Cordy, JJ.

*Joint Enterprise. Evidence,* Joint enterprise, Hearsay, Admissions and confessions, Consciousness of guilt, Cumulative evidence. *Practice, Criminal,* Admissions and confessions, Instructions to jury, Argument by prosecutor, Assistance of counsel, Voluntariness of statement, Capital case. *Constitutional Law,* Admissions and confessions, Voluntariness of statement, Assistance of counsel. *Homicide. Words,* "Functional equivalent," "Interrogation."

At a murder trial, the judge did not err in admitting in evidence statements made by a third party in the presence of the defendant after the shooting, where the statements qualified as statements made by a coventurer in furtherance of an ongoing joint venture [319-320] and as adoptive admissions [320-321]; further, the judge properly admitted evidence of the coventurer's actions demonstrating consciousness of guilt following the shooting, where there was sufficient evidence for a jury to find that the joint venture was ongoing at the time of the coventurer's actions, and that the actions were taken during and in furtherance of the joint venture [321-322].

At a criminal trial, there was no error in the admission in evidence of the defendant's postarrest statement to a police officer, where the statement was not the result of police interrogation, and where the statement was spontaneous and unprovoked [322-325]; however, while the judge erred in admitting the police officer's response, which constituted impermissible hearsay, such improper admission was cumulative of other evidence and did not constitute prejudicial error [325-326].

There was no merit to a criminal defendant's claims that the trial judge improperly allowed in evidence testimony concerning a newspaper article, or that the judge should have given, sua sponte, a limiting instruction concerning the article. [326-327]

At a criminal trial, comments made by a prosecutor during closing argument concerning the defendant's silence, although better left unsaid, did not require reversal [327-329], and the defendant failed to demonstrate on appeal any other errors in the prosecutor's closing argument [329-330].

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the judge's instructions to the jury on the law pertaining to joint venture hearsay [330-331] or from the failure of the defendant's trial counsel to seek an instruction on involuntary manslaughter, or the failure of the judge, sua sponte, to give such an instruction [331-332].

Indictment found and returned in the Superior Court Department on December 29, 2000.

The case was tried before *Linda E. Giles*, J.

*Jeffrey L. Baler* for the defendant.

*Mary E. Lee*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. In July, 2004, a jury in the Superior Court found the defendant guilty of murder in the first degree on a theory of deliberate premeditation, G. L. c. 265, § 1, for his participation in a homicide that had occurred fifteen years earlier, in July, 1989. The defendant was arrested after his coventurer confessed; the two men had successfully concealed their involvement in the crime for more than eleven years.[1]

On appeal, the defendant challenges certain evidentiary rulings by the trial judge; argues that the prosecutor made improper statements in his closing argument; claims that certain of the jury instructions were erroneous; and contends that trial counsel was ineffective for failing to seek a jury instruction on involuntary manslaughter. We affirm the conviction, and conclude that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce the conviction of murder in the first degree or to order a new trial.

1. *Facts.* The evidence presented at trial permitted the jury to find the following facts. The victim was shot to death in the early morning hours of July 3, 1989. An eyewitness, James Jones, testified that he and the victim were talking in the parking lot of a Brockton bakery when Jones noticed a blue pickup truck, in which there were two white men and a tan-colored dog, driving slowly down the street toward them. As the truck approached, Jones heard the passenger say to them, "Did you see . . . ?" Jones then saw a rifle with a scope being pointed out of the passenger side window at them as the passenger said, "Well, how do you like this?" Jones testified that "something told me to get the hell out of here," and he and the victim began to run away from the truck. Four or five rifle shots followed, one of which struck the victim in the back, killing him. Other shots hit a wall and car windows near where Jones had

---

[1]The coventurer, Glen S. Alebord, moved to sever his trial from the defendant's, and the motion was allowed. Alebord's conviction of murder in the second degree as a joint venturer was affirmed on appeal. *Commonwealth v. Alebord*, 68 Mass. App. Ct. 1 (2006).

attempted to take cover. After the truck departed, Jones ran to a convenience store and telephoned 911. The call came in at 2:54 A.M. on July 3.

At the time of the homicide the defendant was living in Whitman with his then-wife, Victoria, in an apartment above one occupied by Glen Alebord and Alebord's girl friend at the time, Heidi Eaton. According to Eaton, between approximately 11 P.M. and midnight on the evening of July 2, the defendant and Alebord, who had been drinking together, drove to Brockton in Alebord's pickup truck "to party," bringing with them two dogs, one black and one tan.[2] Alebord was the driver. Several hours later, Alebord and the defendant returned, awakening Eaton, who joined them in the kitchen.[3] Alebord told Eaton that he and the defendant had become lost in Brockton and had stopped to ask a group of black men for directions. One of the men, he said, had "punched him in the face" and stolen seventy dollars from him. Alebord and the defendant had then driven around the block, while Alebord retrieved his .22 caliber rifle from behind the seat of the truck and passed it to the defendant.[4] The two men drove back to "the group of men" and, as Alebord reported to Eaton, the defendant "shot into the crowd." The defendant was present in the kitchen while Alebord recounted these events to Eaton, but said nothing.

Alebord then told Eaton that he and the defendant were going to return to Brockton with Alebord's shotgun in order to "scare" the men. Alebord retrieved his shotgun from his bedroom, and he and the defendant then left the apartment in the defendant's car. The two men returned to the apartment approximately one hour later, telling Eaton that "where they had been earlier" was now surrounded by police.

Later that same day Alebord's brother showed Alebord a front-page story in the Brockton Enterprise, a local daily newspaper,

---

[2]There was evidence that Brockton is approximately fifteen to twenty minutes away from the Whitman apartment building by automobile.

[3]Heidi Eaton testified that Alebord and the defendant returned sometime between 1 and 3 A.M. Victoria Braley testified that Alebord and the defendant returned in "the middle of the night," but she was not sure of the time. On redirect she testified that the men had returned not later than 1 or 2 A.M.

[4]Eaton testified that she was familiar with Alebord's rifle, that he kept his rifle in his truck, and that his rifle had a scope on it.

concerning the shooting. Eaton testified that after Alebord saw the article, he retrieved the rifle from his truck and disposed of it in a cranberry bog. That same day, Alebord fled to Maine with Eaton and their child. While in Maine, Alebord painted his truck black. Approximately ten days later, Alebord and Eaton returned to Whitman where they met with the defendant and Victoria to discuss the Brockton homicide. During the meeting, according to both Eaton and Victoria, the defendant repeatedly stated, "I can't believe I shot somebody." All four then agreed, in the words of Eaton, that the shooting "would not be discussed again so that nobody would find out." The defendant later moved away from Whitman. He was arrested in Florida in 2001.[5]

2. *Admission of coventurer's statements.* Relying on *Bruton* v. *United States*, 391 U.S. 123, 126 (1968), and *Commonwealth* v. *Brown*, 394 Mass. 510, 515 (1985), the defendant argues that the judge erred in admitting in evidence the statements Alebord made to Eaton in the kitchen of their apartment after the shooting.[6] The judge held that the statements were admissible under two theories, either as being made in furtherance of an ongoing joint venture or as adoptive admissions. *Commonwealth* v. *Brown, supra* (joint venture hearsay exception to confrontation clause). *Commonwealth* v. *Babbitt*, 430 Mass. 700, 705 (2000) (adoptive admissions do not implicate confrontation clause).

As to the joint venture basis, the defendant argues that it was error to admit Alebord's statements in evidence because the Commonwealth had not first established by other nonhearsay evidence that there was a joint venture. The judge's ruling was correct.

Out-of-court statements by joint venturers are admissible against each other if the statements are made "both during the pendency of the cooperative effort and in furtherance of its goal." *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990), quoting *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976). While a statement may be introduced under this

---

[5]Although there is some confusion in the record whether the defendant was arrested in January, 2000, or January, 2001, we infer that the correct date is 2001. In any event the date of his arrest is inconsequential to this appeal.

[6]The defendant filed a pretrial motion in limine to exclude the evidence, which was denied by the judge.

exception to the hearsay rule "only if the existence of the joint criminal venture is shown by some other evidence," *Commonwealth* v. *Colon-Cruz, supra,* the Commonwealth can meet that burden by establishing an "adequate probability of the existence of a common venture, including participation by the given defendant." *Commonwealth* v. *Bongarzone,* 390 Mass. 326, 340 (1983), quoting *Commonwealth* v. *White, supra* at 709 n.7. An "adequate probability" exists when the Commonwealth satisfies a judge "by a preponderance of the evidence that a criminal joint venture took place between the declarant and the defendant." *Commonwealth* v. *Cruz,* 430 Mass. 838, 844 (2000). In determining whether an "adequate probability" exists, the evidence is to be viewed in its light most favorable to the Commonwealth, *Commonwealth* v. *Cartagena,* 32 Mass. App. Ct. 141, 144 (1992), and may be proved by circumstantial evidence. *Commonwealth* v. *Soares,* 384 Mass. 149, 159 (1981), and cases cited.

Here, Jones's eyewitness testimony placed two men in a truck cooperating in the shooting. The driver headed toward the victim slowly enough to allow the passenger to obtain the victim's attention orally, and then either the passenger or the driver fired the rifle at the victim through the open window on the passenger's side of the truck. There was also sufficient evidence to establish an adequate probability that this defendant in fact participated in the shooting. Alebord and the defendant fit the description of the shooters: two white men in a pickup truck in Brockton with a medium-sized tan dog on the evening in question, having in their possession a rifle of the same caliber and description (scope equipped) that was used to commit the murder. This, together with the defendant's repeated inculpatory statement during the Whitman meeting, "I can't believe I shot somebody," was sufficient to establish on the basis of nonhearsay evidence that the defendant participated in a joint venture with Alebord.

It was also proper for the judge to admit Alebord's statements in evidence as adoptive admissions of the defendant. The theory of adoptive admissions is straightforward: "Where a party is confronted with an accusatory statement which, under the circumstances, a reasonable person would challenge, and the

party remains silent or responds equivocally, the accusation and the reply may be admissible on the theory that the party's response amounts to an admission of the truth of the accusation." *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 506 (1992). To be admissible, "it must be apparent that the party has heard and understood the statement, that he had an opportunity to respond, and that the context was one in which he would have been expected to respond to an accusation." *Commonwealth* v. *Olszewski*, 416 Mass. 707, 719 (1993).

There was ample evidence from which the jury could find that the defendant's actions met the requirements articulated in *Commonwealth* v. *MacKenzie, supra,* and *Commonwealth* v. *Olszewski, supra.* Eaton testified that Alebord, in the presence of the defendant, said that the defendant "shot into the crowd," and proceeded to provide further details of how the shooting transpired. This is precisely the type of "accusatory statement which, under the circumstances, a reasonable person would challenge." *Commonwealth* v. *MacKenzie, supra* at 506.

There was also sufficient evidence to warrant a finding that the defendant "heard and understood" Alebord's statement. *Commonwealth* v. *Olszewski, supra.* Eaton testified that the kitchen was not large, and that Alebord and the defendant had been speaking loudly enough to awaken her. Eaton did testify that she did not "remember" whether the defendant "said anything or not," but she clarified that statement by testifying that, if the defendant had said something, she "probably would have remembered it." Her testimony permitted a reasonable inference that the defendant heard and understood Alebord's allegations. The defendant did not respond to or correct Alebord's statements at the time they were made. Nor did he take the opportunity to do so when Alebord left the kitchen to retrieve his shotgun, leaving Eaton and the defendant alone. Alebord's statements were properly admitted as adoptive admissions.

3. *Admission of evidence of coventurer's postcrime actions.* The defendant challenges the admission in evidence of Alebord's actions following the shooting — disposing of his rifle, fleeing to Maine, and painting his truck black — because, the defendant argues, these actions occurred after any joint venture had concluded and therefore cannot be attributed to him. Here,

too, the evidence was properly admitted. The inquiry focuses not on whether the crime itself has been completed, but whether a joint venture was continuing. "Acts of a joint venturer amounting to consciousness of guilt may be attributed to another joint venturer if the acts occurred during the course of a joint venture and in furtherance of it." *Commonwealth* v. *Mahoney*, 405 Mass. 326, 330-331 (1989). Cf. *Commonwealth* v. *Andrews*, 403 Mass. 441, 452 (1988) (if joint venture has ended, subsequent actions of joint venturer cannot be admitted against another).

There was sufficient evidence for a jury to find (assuming they first found that the Commonwealth had proved beyond a reasonable doubt the existence of a joint venture) that the joint venture was ongoing at the time of Alebord's actions, and that Alebord's actions were taken during and in furtherance of the joint venture. Within ten days of the shooting, Alebord returned to Whitman, where he, Eaton, the defendant, and Victoria Braley met and agreed to conceal the involvement of Alebord and the defendant in the crime. See *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993) ("Efforts on the part of a joint venturer to conceal the occurrence of the enterprise's unlawful purpose or to effect an escape warrant the inference that the joint venture continued through the time the statements were made").

4. *Admission of the defendant's postarrest statements.* In January, 2001 (see note 5, *supra*), State Trooper Richard Warmington and a Brockton police detective traveled to Jacksonville, Florida, to take custody of the defendant and return him to Massachusetts. Trooper Warmington testified that he and the detective took custody of the defendant at a Florida pretrial detention facility, and then drove with the defendant to the airport for a commercial flight back to Massachusetts. While in the car on the way to the airport, Trooper Warmington advised the defendant of his Miranda rights.[7]

On arriving at the airport in the mid-afternoon, Trooper

---

[7]At the pretrial hearing on the defendant's motion to suppress the statements at issue here, Trooper Warmington testified that after he advised the defendant of his Miranda rights, he inquired as to whether the defendant understood his rights, and the defendant responded in the affirmative. Trooper Warmington also testified that the detective then asked the defendant whether he had an attorney, to which the defendant responded that, although he did not have one at the time, it was his impression that one would be appointed for

Warmington removed the defendant's handcuffs, as the commercial airline on which they were flying did not permit passengers to be handcuffed either in the terminal or on the aircraft. While waiting in the airport lounge before boarding the plane, the defendant and the officers engaged in what the judge characterized as "light conversation and banter" between themselves and also with the defendant.[8] At one point, the detective left to obtain refreshments. Trooper Warmington stated that the defendant, who was sitting alone with him, suddenly asked, "How did you get on to me?" Trooper Warmington testified, "I told him that his partner wasn't as good as he was in keeping this quiet."

Before trial the defendant moved to suppress both the defendant's statement and Trooper Warmington's response. The motion was denied, and both statements were elicited by the Commonwealth during its examination of Trooper Warmington. On appeal, the defendant argues that because he had invoked his right to counsel, *Miranda* v. *Arizona*, 384 U.S. 436, 444-445 (1966), the subsequent conversations with Trooper Warmington and the detective were a "deliberate elicitation" of information or "the functional equivalent of an interrogation" such that the statements should have been suppressed. See *Massiah* v. *United States*, 377 U.S. 201, 206 (1964); *Commonwealth* v. *Reynolds*, 429 Mass. 388, 393 (1999). We review each statement in turn.

a. *The defendant's statement.* We see no error in the judge's finding that the defendant's statement was not the result of interrogation, nor in her finding that the defendant's statement was voluntary. The defendant's statement was properly admitted.

"The procedural safeguards of *Miranda* are required not where a suspect is merely in police custody, but rather where a suspect is subjected to custodial interrogation." *Commonwealth* v. *Torres*, 424 Mass. 792, 796 (1997), quoting *Rhode Island* v. *Innis*, 446 U.S. 291, 300 (1980). For Miranda purposes, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself," and consists of "express

him on his return to Massachusetts.

[8]Trooper Warmington testified at the pretrial hearing that "[w]e tried to talk about sports a little bit. We talked about him going to Florida, the weather down there, what he had been doing relative to work. Things that had no relevance to the case. . . ."

questioning or its functional equivalent." *Commonwealth* v. *Torres, supra* at 796-797, quoting *Rhode Island* v. *Innis, supra* at 300-301. The term "functional equivalent" includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Commonwealth* v. *Torres, supra* at 797, quoting *Rhode Island* v. *Innis, supra* at 301. The " 'functional equivalence' test does not turn on the subjective intent of the particular police officer but on an objective assessment as to whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances." *Commonwealth* v. *Torres, supra*, quoting *United States* v. *Taylor*, 985 F.2d 3, 7 (1st Cir.), cert. denied, 508 U.S. 944 (1993).

At the airport the defendant was in the custody of the police, but no reasonable person would have perceived the conduct of the two officers to have constituted an "interrogation" as that term is used in *Commonwealth* v. *Torres, supra.* The circumstances in which the "light conversation and banter" transpired were unusual. Trooper Warmington, a veteran law enforcement officer, was tasked with the rendition of a suspect charged with a serious crime. The officers were required to escort the defendant through a public airport in the middle of the day, and then onto a commercial airplane for a lengthy flight back to Boston. They were prohibited throughout from using handcuffs to maintain physical control over the defendant. Trooper Warmington testified that it was therefore necessary to put the defendant at ease to ensure that there was, in the Trooper's words, "no problem getting him on that aircraft."[9] Importantly, the judge credited Trooper Warmington's testimony that he and the detective purposefully avoided discussing with the defendant any issue that may have had relevance to the investigation. A reasonable person would not perceive that the officers, in these circumstances, sought to engage the defendant in conversation for the purpose of the "deliberate elicitation" of inculpatory statements. *Commonwealth* v. *Reynolds, supra* at 393.

[9]Trooper Warmington testified at the pretrial hearing that "[the detective] and I would be speaking about something, and the defendant would jump in . . . . I'm not going to ignore him. He's asking us questions. We're speaking to him. . . . I mean, it's a lot better traveling somewhere on an aircraft when it's amicable."

The judge was also correct in ruling that the defendant's statement to Trooper Warmington at issue here was voluntary. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Commonwealth v. Brant*, 380 Mass. 876, 883, cert. denied, 449 U.S. 1004 (1980), quoting *Miranda v. Arizona, supra* at 478. Volunteered statements of a defendant are admissible even if Miranda errors are otherwise present, *Commonwealth v. Diaz*, 422 Mass. 269, 271 (1996), and "[s]pontaneous and unprovoked statements are admissible even if made after a defendant has invoked his right to remain silent." *Commonwealth v. Brum*, 438 Mass. 103, 115 (2002). According to Trooper Warmington's testimony, which the judge credited, the defendant made the statement, "How did you get on to me?" without any prompting. The judge did not err in ruling that the defendant's statement was voluntary.

Because there was no interrogation and the defendant's statement was voluntary, the protections afforded by *Miranda* are not implicated. See *Commonwealth v. Brum, supra*; *Commonwealth v. Reynolds, supra*. We therefore need not consider whether the defendant's earlier response in the car to the detective's inquiry as to whether he had an attorney constituted an invocation of his right to counsel.[10]

b. *The trooper's response.* In response to the defendant's statement, "How did you get on to me?" the judge permitted Trooper Warmington to testify that "I told him that his partner wasn't as good as he was in keeping this quiet." The trooper's response should not have been admitted. Were it admitted for its truth, it would constitute impermissible hearsay, see *Commonwealth v. DelValle*, 351 Mass. 489, 491 (1966). The Commonwealth suggests that the testimony was properly admitted "not for its truth, but to show the state of police knowledge that

---

[10]We agree with the defendant that there is some ambiguity in the record on several points. It is unclear whether the judge in fact concluded that the defendant had asserted his right to counsel and, if so, when. There is also ambiguity in Trooper Warmington's testimony as to when any such assertion occurred. At the pretrial hearing, Trooper Warmington testified that the defendant responded to the detective's question about an attorney in the car on the way to the airport. On cross-examination, however, defense counsel asked: "[At the point after you responded to the defendant's statement, "How did you get on to me?" he] indicated that he was asserting those rights available to him under Miranda, correct?" The trooper responded, "He did."

drew their attention to the defendant," quoting *Commonwealth* v. *Gaynor*, 443 Mass. 245, 270 (2005). This rationale fails: "The circumstances of the police focus on the defendant were not at issue in this case." *Commonwealth* v. *Rosario*, 430 Mass. 505, 511 (1999).[11] We therefore review to ascertain whether the error is nonprejudicial, that is, whether "the conviction is sure that the error did not influence the jury, or had but very slight effect." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Kotteakos* v. *United States*, 328 U.S. 750, 764-765 (1946).[12] Excluding Trooper Warmington's response entirely from our consideration, there was overwhelming other evidence, from Victoria Braley and from Heidi Eaton, that Alebord and the defendant had jointly participated in the shooting. The improper admission of Trooper Warmington's response was cumulative of other evidence, and does not constitute prejudicial error. See *Commonwealth* v. *Thomas*, 429 Mass. 146, 159-160 (1999).

5. *Limiting instruction.* There is no merit to the defendant's claim that the judge improperly allowed in evidence Eaton's testimony concerning the newspaper article. Because Alebord's postcrime concealment actions were properly admitted, the newspaper article was admissible to demonstrate that Alebord knew that a gun-related homicide had occurred in Brockton earlier that day, and to explain why Alebord then immediately took steps to conceal involvement in the crime.

The defendant also argues, citing *Horta* v. *Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993), certified question answered by 418 Mass. 615 (1994),[13] that the judge should have given, sua sponte, a limiting instruction concerning the article, because the article was

---

[11]The Commonwealth's argument also fails on factual grounds, as the prosecutor did refer to the trooper's response substantively for its truth during his closing argument.

[12]Because the trooper was available for cross-examination, there is no constitutional concern that implicates the confrontation clause. See *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 3 (2005). In making this claim on appeal, the defendant makes reference to his constitutional right to receive due process. His challenge is, however, directed to a straightforward evidentiary ruling, and is thus reviewed under the prejudicial error standard of *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), rather than the harmless beyond a reasonable doubt standard of constitutional claims. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163-164, cert. denied, 525 U.S. 1007 (1998).

[13]In *Horta* v. *Sullivan*, 4 F.3d 2 (1st Cir. 1993), the United States Court of

hearsay and not admissible for its truth. We disagree. The defendant did not make a request for such an instruction, despite his opportunity to do so. See *Commonwealth* v. *Leonardi*, 413 Mass. 757, 764 (1992) ("the law does not require a judge to give limiting jury instructions regarding the purpose for which evidence is offered unless so requested by the defendant").[14] In any event, the newspaper article was not entered in evidence; Eaton merely testified that the article concerned "a shooting in Brockton [in which a] man was shot in the parking lot."[15] The cases on which the defendant relies, *Horta* v. *Sullivan, supra*; *Commonwealth* v. *O'Brien*, 432 Mass. 578, 589 (2000); and *Commonwealth* v. *Jackson*, 384 Mass. 572, 577-579 (1981), are inapposite. In each case the article or its specific content was entered in evidence. Where, as here, the defendant raises for the first time on appeal a claim concerning the failure to give a limiting instruction, we review to determine whether there is a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Hamilton*, 411 Mass. 313, 323 (1991). Having done so, we conclude there was no error.

6. *Commonwealth's closing argument.* In his closing argument the prosecutor made the following statement:

> "[W]hat does [the defendant] say? Here's a guy, eleven years after a homicide, living in another state, what does he say to the trooper? You've got the wrong man, what am I doing here, I live in Florida? I didn't kill anybody, what

Appeals for the First Circuit considered a plaintiff's appeal from a grant of summary judgment to the defendant police officers in a civil action pursuant to 42 U.S.C. § 1983 (2000). In evidence was a newspaper article describing certain police tactics employed during the motor vehicle chase in which the plaintiff was injured. The court held that the article was "hearsay within hearsay," and should not have been considered by the motion judge in deciding whether the plaintiff had raised a genuine issue of material fact. *Id.* at 8-9.

[14]Eaton's testimony concerning the newspaper article was preceded by a lengthy sidebar discussion at which defense counsel objected on hearsay grounds to any testimony concerning the content of the article. The judge overruled this objection.

[15]In overruling the objection to testimony regarding the newspaper article, the judge explained at sidebar that the evidence was "not being offered for the truth of the matter asserted; no one is disputing that [the victim] was murdered, and it was a headline in the paper. So it's not being offered for the truth of the matter asserted, merely that it was actually shown to [Alebord] who in turn flees the jurisdiction and tries to conceal the joint venture."

are you doing? What am I going back to Massachusetts for? No. He say [*sic*] seven words, seven words: "How did you get on to me?"

The defendant objected at trial, and asserts on appeal that this statement was an unconstitutional comment on the defendant's right to silence, see *Commonwealth* v. *Mahdi*, 388 Mass. 679, 694 (1983), and *Doyle* v. *Ohio*, 426 U.S. 610, 617-618 (1976). The statements should not have been made by the prosecutor. We therefore "assess the record as a whole to determine the probable impact of the improper comments." *Commonwealth* v. *Mahdi*, *supra* at 696. The *Mahdi* court suggested five factors in determining whether an error is harmless beyond a reasonable doubt: "(1) the relationship between the [statement] and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions." *Id* at 696-697.

The prosecutor's comment on the defendant's silence touched on the premise of the defense: misidentification. But there was other corroborated evidence of the defendant's guilt, and the prosecutor's reference was not extensive. Importantly, at the defendant's request, the judge immediately issued a strong curative instruction, referencing directly the defendant's challenge to that portion of the prosecutor's closing argument. See *Commonwealth* v. *Peixoto*, 430 Mass. 654, 661 (2000) (where judge gave explicit and thorough instruction that defendant's hesitation to speak to police was not to be held against him, and where evidence against defendant was substantial, error was harmless). Cf. *Commonwealth* v. *Mosby*, 11 Mass. App. Ct. 1, 10-11 (1980) (failure of instruction to "point out the particulars which were the basis and purpose for the defendant's request for an additional instruction" contributed to finding of reversible error). In her final charge to the jury, the judge reinforced her instruction, reiterating the defendant's right against self-incrimination and noting that closing arguments are not evidence.

Closing arguments must be viewed "in the context of the entire argument, and in light of the judge's instruction to the jury, and the evidence at trial." *Commonwealth* v. *Colon-Cruz*, 408 Mass.

533, 553 (1990). After a careful evaluation of the prosecutor's comments in their context, we conclude that the remarks, "although better left unsaid, [do] not require reversal." *Commonwealth* v. *Wallace*, 417 Mass. 126, 133 (1994).

Next, the defendant argues that his due process rights were violated by references in the prosecutor's closing argument to facts not in evidence.[16] See note 13, *supra.* A prosecutor must limit his closing comments to "the evidence and the fair inferences which can be drawn from the evidence." *Commonwealth* v. *Hoffer*, 375 Mass. 369, 378 (1978). We conclude there was no error.

As to the prosecutor's references to "murder" (to which the defendant objected at trial), the prosecutor asked Eaton whether the Whitman meeting concerned "the homicide," and she responded in the affirmative; Victoria Braley's testimony was that the meeting concerned "the shooting." A homicide is the killing of one person by another. Not every homicide is a murder, nor is every shooting a murder; "murder" is not a fact but a crime that must be proved. But a prosecutor may argue the inference that a "homicide" or a "shooting" is a "murder," and the prosecutor's decision to do so here was warranted.[17] *Commonwealth* v. *Johnson*, 374 Mass. 453, 459-460 (1978), subsequent motion for new trial vacated, 409 Mass. 405 (1991) (prosecutor entitled to marshal evidence and argue for decision of controversy in favor of Commonwealth).

The defendant did not object at trial to the other aspects of the prosecutor's closing that he now challenges on appeal. We review these claims to determine whether there exists a substantial likelihood of a miscarriage of justice. *Commonwealth*

[16]The prosecutor stated that Eaton was "sure" that Alebord and the defendant left "in a blue pickup truck"; Eaton testified that the truck was "dark color[ed]." The prosecutor stated that Eaton said the defendant "stood there, not saying a word" in the kitchen; Eaton testified that she did not "remember" if the defendant "said anything or not." The prosecutor stated that at the Whitman meeting, the four participants all promised that " '[w]e're never going to talk about this murder,' and I submit to you, it's the murder of [the victim]"; Eaton testified that "*it* would not be discussed again" (emphasis added). The prosecutor said the newspaper article concerned a "murder"; Eaton testified that the article concerned a "shooting."

[17]For the same reason there was no error in the prosecutor's reference to the newspaper story as a "story of the murder of [the victim] at that parking lot."

v. *Allison*, 434 Mass. 670, 686-687 (2001). While Eaton testified that she did not remember whether the defendant "said anything or not" when in the kitchen, she immediately clarified her statement, testifying that if the defendant had said something, "I probably would have remembered it." As we have just stated, a prosecutor is entitled to argue for a decision of the controversy in favor of the Commonwealth, *Commonwealth* v. *Johnson, supra*, and the prosecutor's reference to Eaton's testimony about the defendant's silence in the kitchen was permissible. Finally, while the prosecutor misstated Eaton's testimony regarding the color of the truck, the prosecutor himself reminded the jury prior to his closing argument that "it's your memory that rules." This point was reinforced by the judge in her charge to the jury. These prosecutorial statements, even if made in error, did not give rise to a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Allison, supra.*

7. *Jury instruction on joint venture hearsay evidence.* The defendant argues that the judge improperly instructed the jury on the law pertaining to joint venture hearsay.[18] The defendant did not object at trial, but argues now that the judge should have instructed the jury to consider the statements and actions of Alebord only if and when the joint venturers were acting to conceal the crime *in furtherance of* the joint venture. Because the judge did not do so, he argues, the jury may erroneously have believed that they could consider any actions taken by Alebord to conceal the crime, even if those actions occurred after the joint venture had ended.

Although a more precise instruction might have been preferable, there is no merit to the point. The Commonwealth placed in evidence only statements made (or actions taken) by Alebord that were alleged to have occurred before the Whitman meeting, and which therefore occurred during the joint venture itself. In a case of murder in the first degree, when the defendant fails at trial to claim an error in a jury instruction, "our review of the

[18]The judge instructed that the jury could consider Alebord's statements and actions "only with respect to acts and statements occurring while the joint venture existed *or* made when the joint venturers were acting to conceal the crime, and that are relevant to the joint venture of which you have found the defendant and . . . Alebord were members" (emphasis added).

charge is limited to determining whether there is an error in the charge which creates a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Reid*, 384 Mass. 247, 258 (1981). Any such error here does not give rise to a substantial likelihood of a miscarriage of justice.

8. *Involuntary manslaughter instruction*. We reject the defendant's claim, made for the first time on appeal, that the failure of his trial counsel to seek an instruction on involuntary manslaughter, or the failure of the judge, sua sponte, to give such an instruction created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *DeMarco*, 444 Mass. 678, 684-685 (2005). We reach this conclusion for essentially the same reasons that the Appeals Court articulated in the case of the defendant's coventurer. *Commonwealth* v. *Alebord*, 68 Mass. App. Ct. 1, 6-9 (2006).

Even if requested, the judge need not have given the instruction. Involuntary manslaughter is an unlawful homicide where "wanton and reckless conduct causes death, or . . . where an unintentional killing 'result[s] from a battery not amounting to a felony which the defendant knew or should have known endangered human life.' " *Commonwealth* v. *Simpson*, 434 Mass. 570, 590 (2001), quoting *Commonwealth* v. *Fryar*, 425 Mass. 237, 248, cert. denied, 522 U.S. 1033 (1997). In determining whether an involuntary manslaughter instruction must be given, we ask whether any "reasonable view of the evidence would have permitted the jury to find 'wanton and reckless' conduct rather than actions from which a 'plain and strong likelihood' of death would follow." *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998). In doing so, "we draw all reasonable inferences from the evidence in favor of the defendant." *Commonwealth* v. *Dyous*, 436 Mass. 719, 731 (2002). A judge is not required to instruct on involuntary manslaughter when it is obvious that "the risk of physical harm to the victim creates a 'plain and strong likelihood that death would follow.' " *Commonwealth* v. *Souza*, 428 Mass. 478, 493 (1998), quoting *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996).

Eaton testified that, while in the kitchen, Alebord stated that the defendant "shot *into* the crowd" (emphasis added). The defendant did not counter this allegation. There is no suggestion in the evidence that the defendant fired into the air, thereby

distinguishing the circumstances here from the circumstances in the cases relied on by the defendant. See *Commonwealth* v. *Gibson*, 424 Mass. 242, 244 (1997); *Commonwealth* v. *Koonce*, 418 Mass. 367, 369 (1994). See also *Commonwealth* v. *Kinney*, 361 Mass. 709, 712-713 (1972). "Absent some evidence that the defendant's knowledge was impaired, intentionally discharging a firearm in the direction of another person creates a plain and strong likelihood of death." *Commonwealth* v. *Mack*, 423 Mass. 288, 290 (1996). See *Commonwealth* v. *Simpson*, *supra* at 590, quoting *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 547 (1993) ("When it is obvious that the risk of physical harm to the victim creates a 'plain and strong likelihood that death would follow,' . . . an instruction on involuntary manslaughter is not warranted"). Firing a rifle multiple times, directed toward specific individuals, provides a sufficient basis to conclude that the defendant understood the likely deadly consequences of his actions. There was no error.[19]

This also disposes of the defendant's claim of ineffective assistance of counsel. See *Commonwealth* v. *Lee*, 32 Mass. App. Ct. 85, 90-91 (1992) (where evidence indicates that judge would have denied motion, it is not ineffective assistance if counsel failed to file such motion).

9. *General Laws c. 278, § 33E.* We have reviewed the entire record in accordance with the requirements of G. L. c. 278, § 33E. We conclude that the verdict is supported by the evidence and is consonant with justice. The defendant engaged in a deliberate, unprovoked attack on two defenseless men. There is nothing in the record of this case to suggest that we exercise our extraordinary power to reverse the verdict, reduce the conviction, or order a new trial.

*Judgment affirmed.*

---

[19]In the alternative, the defendant argues that an involuntary manslaughter instruction was warranted because Alebord told Eaton that he and the defendant only intended to "scare" the men in the parking lot. However, an intent to scare need not be mutually exclusive of an intent to aim at a particular individual. Given the evidence that the defendant intentionally shot into the crowd, his alleged intent only to scare does not satisfy the requirements for an involuntary manslaughter instruction. See *Commonwealth* v. *Mack*, 423 Mass. 288, 290 (1996) (no involuntary manslaughter instruction required where defendant fired weapon several times in direction of victim allegedly only "in order to scare").