SANDERS, COMMONWEALTH vs., 101 Mass. App. Ct. 503

 
 COMMONWEALTH vs. ODELL SANDERS.

101 Mass. App. Ct. 503
 April 26, 2022 - August 15, 2022

Court Below: Superior Court, Suffolk County
Present: Green, C.J., Wolohojian, & Henry, JJ.

 

No. 20-P-735.

Homicide. Assault and Battery by Means of a Dangerous Weapon. Firearms. Motor Vehicle, Firearms. Evidence, Joint venturer, Joint enterprise, Impeachment of credibility. Joint Enterprise. Practice, Criminal, Argument by prosecutor.

At the trial of indictments charging the defendant with, inter alia, murder under a theory of joint venture liability, the evidence was sufficient for the jury to conclude that the defendant shared with his coventurers (i.e., the passengers in the vehicle he was driving) the required criminal intent to commit a deadly assault on the victims, where one coventurer initiated a verbal encounter with one of the victims, the defendant subsequently followed the victims' vehicle for four minutes at a high rate of speed and then positioned his vehicle in the oncoming lane of traffic alongside the victims' vehicle, and an onslaught of gunshots erupted from three different weapons inside the defendant's vehicle within moments thereafter. [507-511]

At a criminal trial, no substantial risk of a miscarriage arose from the prosecutor's single reference to the defendant in closing argument as a "liar" or from the prosecutor's characterization of the defendant's defense; moreover, the prosecutor did not improperly appeal to the jury's sympathies by briefly eliciting testimony describing personal details about the victims or by describing one victim's injuries, and any concern about florid statements in the prosecutor's closing argument were mitigated by the judge's instruction that the jury must determine the facts based solely on the evidence; finally, although the prosecutor should not have explored evidence regarding the defendant's pretrial silence or commented on it during closing argument, the error was harmless beyond a reasonable doubt, where, given the demonstrably false account provided by the defendant in his statement to police, including inconsistencies with the physical evidence, little incremental harm followed from the prosecutor's reference to the defendant's failure to initiate a report to police. [511-515]

There was no merit to the defendant's contention that the cumulative effect of his claims of error required a new trial. [515] 

Indictments found and returned in the Superior Court Department on September 12, 2018.

 The cases were tried before Mitchell H. Kaplan, J.

 Page 504 

 Sara A. Laroche for the defendant.

 Paul B. Linn, Assistant District Attorney, for the Commonwealth.

 GREEN, C.J. On the evening of July 25, 2018, the defendant maneuvered his vehicle into the oncoming lane of traffic and pulled alongside a black Audi sport utility vehicle (Audi) that was stopped at a traffic light. The occupants of the defendant's vehicle opened fire into the Audi, leaving its driver dead and the passenger seriously injured. The defendant was charged with murder in the first degree in connection with the shooting, but his passengers were never identified. Following a trial, a Superior Court jury convicted the defendant of the lesser included offense of murder in the second degree, assault and battery by means of a dangerous weapon causing serious bodily injury, unlawful possession of a firearm, and carrying a loaded firearm. [Note 1]

 On appeal, the defendant contends that the Commonwealth presented insufficient evidence to support his convictions under a joint venture theory, and that the prosecutor's conduct was so prejudicial that he was not afforded a fair trial. We affirm.

 Background. [Note 2] 1. Facts. On the evening in question, brothers Jorge and Ashby Baez were visiting friends in the Franklin Field housing development in the Dorchester section of Boston. [Note 3] Shortly before 11 P.M., the brothers headed home in the Audi. Jorge drove, and Ashby was in the front passenger seat.

 The brothers traveled down Westview Street and turned right onto Blue Hill Avenue. While stopped at a traffic light on Blue Hill Avenue, a silver Honda CRV (Honda) driven by the defendant pulled alongside the driver's side of the Audi. A passenger in the back seat of the Honda asked Jorge where he was from. Jorge did not respond to the inquiry; instead, he drove away and took a right turn down Talbot Avenue. Video footage from the area showed the Honda following the Audi thereafter for approximately four to five minutes.

 Both vehicles ended up on Norfolk Street, where several witnesses, including an off-duty Boston police officer, were standing 

 Page 505 

on the street. They observed the Audi speed down the street, with the Honda following closely behind. The Audi came to a stop at a traffic light. The witnesses then heard the screech of the Honda's tires as it pulled over the double yellow line into the oncoming lane of traffic and stopped next to the driver's side of the Audi, slightly to its rear. [Note 4] "Moments later," gunshots rang out. In the span of less than four seconds, sixteen shots were fired from the Honda toward the Audi. No words were exchanged before the shots were fired. The driver's side rear passenger window and the front passenger's side window of the Audi were shot out, but the front driver's side window was intact. The Honda then was driven away down Norfolk Street. Ballistics analysis of bullets and cartridge cases recovered from the scene later revealed that at least three guns were used to fire on the Audi: a nine millimeter Luger, a .25 caliber automatic, and a .40 caliber Smith & Wesson.

 The witnesses to the shooting came to the aid of the occupants of the Audi. Jorge had been shot in the left side of his torso and was ultimately declared dead at the scene. Ashby suffered a gunshot wound to his left temple and was transported to the hospital for treatment. He is permanently blind in both eyes as a result of his injuries.

 Approximately forty-five minutes after the shooting, the defendant called his mother and told her that someone had shot at him. The defendant's mother, who was the registered owner of the Honda, told the defendant to come back to the home that they shared with the defendant's stepfather. [Note 5] When the defendant arrived home, he told his stepfather that he was driving on Blue Hill Avenue when a vehicle pulled up and someone began yelling. He then saw flashes and heard glass shatter so he sped away.

 Meanwhile, Boston police officers investigating the shooting were provided with a description of the Honda by the witnesses. After conducting a search, an officer located a report concerning a vehicle matching the make, model, and color of the one described that was connected to the defendant's home address. Acting on the information from this report, police officers arrived at the defendant's house around midnight and observed the defendant's stepfather backing the Honda into the driveway. The 

 Page 506 

stepfather informed the police that he was helping his son because someone had just shot at him.

 The defendant was across the street moving another vehicle into the driveway. When an officer tapped on the window of that vehicle and announced himself, he noticed the defendant lightly hit the bumper of the Honda as he parked the other vehicle in the driveway and struggled to put the vehicle in park. The defendant appeared nervous, was "wide-eyed," was breathing very heavily, and did not initially acknowledge the officer's presence. He was dressed in a tank top and compression-style underwear.

 The defendant eventually told the officer that he was shook up because he was "just shot at." The defendant explained that he was recording music with a friend, "Old Boy or Mr. Old Boy," that evening. He was traveling home alone in the Honda down Norfolk Street near Codman Square when a black Audi pulled up next to him and someone in that vehicle asked if the defendant was "so and so." The defendant inquired what the person was talking about, at which point shots were fired at him. The defendant reported that he then called his mother and immediately went home.

 On inspection of the Honda, the police observed that the front passenger's side window was broken, but that very little glass was inside the vehicle or in the driveway. The police also noted fresh ballistics damage on the rear passenger's side doorjamb of the vehicle. The Honda was further searched pursuant to a warrant, and police recovered three cartridge casings from inside the vehicle: one .40 caliber Smith & Wesson spent cartridge casing under the front passenger seat; another .40 caliber Smith & Wesson spent cartridge casing underneath the driver's seat; and one .25 caliber spent cartridge casing in the rear passenger compartment underneath the seatbelt casing. Gunshot residue also was found inside the front passenger and rear passenger windows of the Honda. A bullet hole in the frame of the rear passenger's side window indicated that a bullet was fired from inside the Honda. The victims' Audi also was searched, but no firearms or spent cartridge casings were found in that vehicle.

 The defendant was arrested one week after the shooting. He waived his Miranda rights and gave a statement to the police. He again explained that he was shot at while driving home alone from Old Boy's recording studio around 11:35 P.M. The defendant explained that he did not know Old Boy's exact address, but he lived in a light green house on Moultrie Street. The police 

 Page 507 

attempted to identify and locate Old Boy, but were unable to do so based on the information provided by the defendant or their own additional investigative efforts. [Note 6]

 2. Defendant's case. The defendant testified on his own behalf at trial. He maintained that he was at the recording studio in Old Boy's house that evening. While the defendant was at the studio, Romario Cameron, a man with whom the defendant was previously acquainted from school, and two of Cameron's friends arrived. At Cameron's request, the defendant left the studio to give Cameron and his friends a ride to Cameron's house in the Hyde Park section of Boston. Cameron rode in the front passenger seat, and his friends were in the back seat.

 While in the Honda, Cameron got into a "dispute" with the occupants of the Audi before it was driven off. Cameron then brandished a gun, pointed it at the defendant's stomach, and told the defendant to follow that vehicle. The defendant complied, and when they arrived at Norfolk Street, Cameron directed the defendant to pull up next to the vehicle. When the defendant did so, Cameron stuck his hand out of the window and began shooting. The defendant ducked because he believed that shots also were being fired in his direction. Cameron again pointed the gun at the defendant and told him to drive to Morton Street. At Morton Street, Cameron and his two friends cleaned out the Honda. Cameron then directed the defendant to drive them to Hyde Park.

 When the defendant dropped off his passengers, Cameron verified the defendant's address by looking at the identification in his wallet and threatened to kill the defendant and his family if the defendant told anyone about the shooting. The defendant did not tell the police about Cameron when they arrived at his house or following his arrest because he was scared; however, the defendant testified that he was no longer scared because Cameron was deceased by the time of trial.

 Discussion. 1. Sufficiency of the evidence. The Commonwealth prosecuted the defendant on the theory that the defendant and his unidentified passengers participated in a joint venture to shoot Jorge and Ashby. The defendant unsuccessfully moved for a required finding of not guilty at the close of the Commonwealth's case. In our review of the denial of that motion, "we consider whether the evidence, together with all reasonable and possible 

 Page 508 

inferences that may be drawn from it, is sufficient to permit a rational jury to find beyond a reasonable doubt the existence of every element of the crime charged." Commonwealth v. Swafford, 441 Mass. 329, 339 (2004). [Note 7]

 To support a conviction on a theory of joint venture liability, "it was the Commonwealth's burden to show that the defendant (a) 'participated in the commission of the crime charged,' (b) did so 'knowingly,' and (c) 'shared the required criminal intent.'" Commonwealth v. Gonzalez, 475 Mass. 396, 406 (2016), quoting Commonwealth v. Britt, 465 Mass. 87, 100-101 (2013). The required criminal intent for murder is malice aforethought, defined as "includ[ing] any unexcused intent to kill, to do grievous bodily harm, or to do an act creating a plain and strong likelihood that death or grievous harm will follow." [Note 8] Commonwealth v. Lowe, 391 Mass. 97, 107, cert. denied, 469 U.S. 840 (1984).

 It was clearly established that the defendant was present at the scene as the driver of the Honda from which the shots were fired. The question, then, is whether the evidence, viewed in the light most favorable to the Commonwealth and drawing all reasonable and possible inferences in its favor, also established that the defendant knew of and shared the intent with his passengers to shoot at the victims.

 The Supreme Judicial Court recently considered whether joint venture liability may attach to a defendant who allegedly drove a shooter and another coventurer to and from the scene of a lethal shooting in Baxter v. Commonwealth, 489 Mass. 504 (2022). In that case, the court explained that "the evidence of the defendant's maneuvering of the vehicle may have allowed the jury to infer that the defendant knew of and shared the passenger's intent to assault the victim," but that "it fail[ed] to sustain a reasonable inference, beyond a reasonable doubt, that he shared the passenger's intent that the attack be deadly." Id. at 510. [Note 9]

 In the present case, the jury likewise reasonably could have 

 Page 509 

inferred that the defendant shared the passengers' intent to assault the victims, where the defendant positioned the Honda in the oncoming lane of traffic alongside the Audi, and slightly to its rear, as it was stopped at a traffic light prior to the attack, and fled the scene thereafter. See Baxter, 489 Mass. at 510. Cf. Commonwealth v. Roman, 74 Mass. App. Ct. 251, 254 (2009) (defendant drove vehicle in manner to support inference that defendant participated in venture with other occupants of car to traffic cocaine and sought to make venture succeed).

 The issue remains whether the jury could have found that the defendant shared an intent that the attack be lethal. On this point, Baxter, 489 Mass. 504, is distinguishable. In Baxter, the court concluded that insufficient evidence was presented that the defendant shared his passenger's intent to commit a deadly attack where the defendant, accompanied by the shooter, followed the victim by car as the victim walked down the street, the defendant pulled his vehicle around a corner, the shooter appeared on foot less than a minute later, the shooter approached and shot the victim from behind, and then the shooter and a man acting as a lookout returned to the defendant's vehicle before it sped away. Id. at 506-507, 511.

 The defendant in the present case did not let his passengers out of the Honda so that the attackers had different options for how to attack the victims. Instead, a reasonable and strong inference from the evidence (viewed in the light most favorable to the Commonwealth) was that he positioned the Honda so that the occupants could attack the occupants of the Audi from inside the Honda. Moreover, the attack occurred from within the Honda, in the defendant's presence, and within moments after the defendant positioned the Honda to facilitate the attack. This distinction is material. An attack perpetrated by a person on foot against another person can take many forms, including ones not necessarily involving deadly force. In contrast, any attack perpetrated by occupants inside a vehicle against victims inside another vehicle is far more likely to require use of a lethal weapon like a firearm. Contrast Gonzalez, 475 Mass. at 417 (insufficient evidence of possible driver's lethal intent when driver dropped shooter off at scene of shooting but no evidence presented that defendant heard perpetrators express lethal intent, or that defendant saw weapons); Commonwealth v. Mandile, 403 Mass. 93, 100-102 (1988) (insufficient evidence of lethal intent where driver transported armed passenger to and from scene of murder, 

 Page 510 

but waited outside while crime occurred). The strong likelihood that any attack the defendant sought to facilitate must involve a weapon like a firearm supports a reasonable inference that the defendant shared the intent with the Honda's other occupants to shoot the victims. See, e.g., Commonwealth v. Mack, 423 Mass. 288, 290 (1996) (firing gunshots in direction of others created "plain and strong likelihood of death").

 The defendant argues that his conduct could have reflected an intent merely to engage in another verbal altercation with the occupants of the Audi, as had occurred earlier on Blue Hill Avenue. That argument is belied by the circumstances present here. The shooting occurred moments after the defendant brought the Honda to a screeching stop in the oncoming traffic lane next to, but slightly behind, the Audi as it was stopped. [Note 10] No words were exchanged before the shots were fired. Though there was no direct evidence presented during the Commonwealth's case that the defendant knew his companions were armed, the number and variety of weapons used in the attack support a reasonable inference that the defendant knew his companions were armed. Taken together, the evidence supports the inference of a coordinated, deadly attack that required that the driver of the Honda shared the intent to carry it out. See Commonwealth v. Watson, 487 Mass. 156, 164-165 (2021) (sufficient evidence that driver shared shooter's intent to murder victim where driver dropped shooter off, drove slowly behind illuminating shooter in headlights, and picked up shooter after victim was shot ten times).

 In sum, a reasonable jury could have found beyond a reasonable doubt that the defendant shared the intent to commit a deadly assault on the occupants of the Audi based on the evidence that a passenger in the Honda initiated a verbal encounter with one of the victims, the defendant subsequently followed the Audi for four minutes at a high rate of speed, the defendant maneuvered the Honda into the oncoming lane of traffic to pull alongside the stopped Audi, and an onslaught of gunshots erupted from three 

 Page 511 

different weapons inside the Honda within moments thereafter.

 2. Improper argument. The defendant separately argues that he was denied the right to a fair trial where the prosecutor disparaged the defendant and the defense in closing argument, appealed to the sympathies of the jury, and improperly commented on the defendant's prearrest silence. We consider each contention in turn.

 a. Disparagement. The defendant contends that the prosecutor improperly built her closing argument on a theme that the defendant was a "liar" and characterized his defense as "garbage." Because the defendant did not lodge an objection to the closing argument, "we review to determine whether the . . . argument [was] improper and, if so, whether [it] created a substantial risk of a miscarriage of justice." Commonwealth v. Espinal, 482 Mass. 190, 204 (2019). "Closing arguments must be viewed 'in the context of the entire argument, and in light of the judge's instruction to the jury, and the evidence at trial.'" Commonwealth v. Braley, 449 Mass. 316, 328-329 (2007), quoting Commonwealth v. Colon-Cruz, 408 Mass. 533, 553 (1990).

 Contrary to the defendant's contention, the prosecutor referred to the defendant only once as a "liar." And that single reference followed the prosecutor's inventory of specific instances, grounded in the evidence presented at trial, where the defendant lied to the police and his parents about the shooting. See Commonwealth v. Ramos, 73 Mass. App. Ct. 824, 826 (2009) (prosecutor may marshal evidence and urge jury to disbelieve defense witness). Where the defendant himself testified that he lied to the police and others during the investigation and after his arrest, we are not left with concern that a single reference to the defendant as a "liar," immediately following a description of lies established by the evidence, created a substantial risk of a miscarriage of justice.

 The defendant also takes issue with the prosecutor's characterization of his testimony that Cameron held him at gunpoint during the shooting as "garbage," "crazy," and "completely ridiculous." Assuming, without deciding, that these three comments crossed into "excessive rhetoric," Commonwealth v. Fahey, 99 Mass. App. Ct. 304, 313 (2021), we discern no substantial risk of a miscarriage of justice where the characterizations were, at most, fleeting. Moreover, while the defendant contends that his testimony about Cameron went to the heart of his entire defense, it was permissible for the prosecutor to challenge 

 Page 512 

the defendant's version of events by pointing to evidence in the trial record that the defendant accepted an incoming FaceTime [Note 11] call and made outgoing cell phone calls during the time he allegedly was held at gunpoint by Cameron. See Commonwealth v. Grandison, 433 Mass. 135, 141-142 (2001).

 b. Appeal to sympathies. The defendant next argues that the prosecutor played to the jury's sympathies by drawing out irrelevant personal details about the brothers, highlighting the "grotesque" nature of Ashby's injuries, and describing how Ashby's life changed after the day of the attack.

 Jorge's girlfriend, who also is the mother of his child, provided testimony about Jorge and his brother. This brief testimony was permissible "to tell the jury something of the person whose life had been lost in order to humanize the proceedings." Commonwealth v. Santiago, 425 Mass. 491, 495 (1997), S.C., 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). The testimony spanned only five pages of the transcript in a six-day trial. Moreover, when defense counsel objected, the judge properly directed the prosecutor to proceed to her next line of questioning. We discern in the brief testimony no cause for relief.

 The description of Ashby's injuries was relevant to prove the charge of assault and battery by means of a dangerous weapon causing serious bodily injury. See G. L. c. 265, § 15A (d) (defining "serious bodily injury" as "bodily injury which results in a permanent disfigurement, loss or impairment of a bodily function, limb or organ, or a substantial risk of death"). See also Commonwealth v. Nelson, 90 Mass. App. Ct. 594, 597 n.4 (2016) (Commonwealth not relieved of burden to prove elements of offense even if not live issue at trial). The descriptions were admittedly vivid; however, the judge appropriately limited the testimony about Ashby's medical condition even without an objection. There was no error. Cf. Commonwealth v. Bell, 473 Mass. 131, 145 (2015), cert. denied, 579 U.S. 906 (2016) (no abuse of discretion to admit "graphic" and "disturbing" photographs of victim's injuries relevant to prove element of offense).

 Finally, as the Commonwealth concedes, the prosecutor made "moderately florid" statements during closing argument, describing the day of the shooting as "the last day that [Ashby] got to spend with his brother . . . and it was the last day that he had the 

 Page 513 

gift of sight" as well as explaining that Ashby "now lives in a state of permanent darkness." Any concern, however, was mitigated by the judge's instruction that the jury must determine the facts based solely on the evidence, and not on emotion, sympathy, or personal feelings. Moreover, given the violent and seemingly unprovoked nature of the crime that left one man dead and another permanently blind, "it is unlikely that the prosecutor's argument had an inflammatory effect on the jury beyond that which naturally would result from the evidence presented." Commonwealth v. Bois, 476 Mass. 15, 35 (2016). These statements fall short, in the context of the present case, of creating a substantial risk of a miscarriage of justice. See Espinal, 482 Mass. at 204.

 c. Prearrest silence. The defendant also argues that the prosecutor improperly urged the jury to infer the defendant's guilt based on his failure to call 911 between the shooting and the arrival by police at his house roughly one hour later, and the fact that the defendant declined a detective's invitation to give a formal statement at police headquarters that evening.

 The defendant objected on two occasions with respect to this issue, once to the prosecutor's statement during her opening that the defendant declined an invitation to come in to the police station for a formal interview, and once to a detective's testimony that the police did not receive a 911 call from the defendant. [Note 12] We review those instances to determine whether there was error and, if so, whether the error was harmless beyond a reasonable doubt. See Braley, 449 Mass. at 328. [Note 13]

 "In general, impeachment of a defendant with the fact of his prearrest silence should be approached with caution, and, wherever it is undertaken, it should be prefaced by a proper demonstration that it was 'natural' to expect the defendant to speak in the circumstances." Commonwealth v. Nickerson, 386 Mass. 54, 

 Page 514 

62 (1982). In the present case, it is far from clear that it would have been "natural" for the defendant to call police to report that he had been the victim of a shooting. [Note 14] Moreover, as a practical matter there was limited opportunity for the defendant to have made a report between the time he returned the Honda to his mother's home and the time police arrived there as part of their investigation. [Note 15] The prosecutor should not have explored evidence on the subject, or commented on it during closing argument.

 However, we discern in the error no cause for relief. Commonwealth v. Irwin, 72 Mass. App. Ct. 643, 653-654 (2008), on which the defendant relies, involved a credibility contest between the child victim of an indecent assault and battery and the defendant. In the present case, by contrast, the defendant acknowledged that he lied to police in his initial interview asserting that he had been the victim of a shooting. [Note 16] We also observe that the defendant himself testified as part of his direct testimony that he was planning to contact the police before they arrived at his house and that he would have given the same false account had he called 911 immediately after the shooting. In light of the demonstrably false account provided by the defendant in his statement to police, including especially the inconsistencies with the physical evidence, we discern little incremental harm to have followed from the prosecutor's reference to the defendant's failure to initiate such a report for the purpose of emphasizing its falsity. To the extent the comments affected the defendant's alternative "carjacking" defense at trial, the comments did not cause prejudice, since (if they believed the defendant's account) the jury could well have viewed the defendant's failure to call police to have been the product of fear of his attackers. Cf. Commonwealth v. 

 Page 515 

Gonzalez, 68 Mass. App. Ct. 620, 631 (2007). See note 14, supra. In the circumstances, we consider the defendant's preserved claims harmless beyond a reasonable doubt, see Braley, 449 Mass. at 328, and discern no substantial risk of a miscarriage of justice flowing from the other instances, see Grandison, 433 Mass. at 141-142.

 d. Cumulative error. Finally, the defendant maintains that, even if none of his individual claims of error warrants relief, the cumulative effect of his claims requires a new trial. As we have explained, most of the defendant's claims of improper argument did not constitute error at all. In any event, in the context of the evidence taken as a whole, we are persuaded that "[a]ny cumulative error . . . was 'no more prejudicial than any individual errors, which had minimal impact, if any.'" Commonwealth v. Lessieur, 488 Mass. 620, 632 (2021), quoting Commonwealth v. Duran, 435 Mass. 97, 107 (2001).

 Judgments affirmed.

FOOTNOTES
[Note 1] The jury acquitted the defendant on a charge of armed assault with the intent to murder Ashby Baez. A charge of accessory after the fact to murder was dismissed in light of the verdicts on the other charges. 

[Note 2] We recite the facts in the light most favorable to the Commonwealth. See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979). 

[Note 3] Because the Baez brothers share a last name, we refer to them by their first names. 

[Note 4] One witness observed a hand reach out, possibly from the passenger's side of the Honda. 

[Note 5] Although the defendant's mother owned the Honda, the defendant was permitted to use it on a daily basis. 

[Note 6] The defendant told police that he did not know Old Boy's real name and that he only communicated with Old Boy via Facebook Messenger. 

[Note 7] Because the defendant moved at the close of the Commonwealth's case for a required finding of not guilty, we assess the evidence as it stood at that point. Accordingly, we do not consider the defendant's acknowledgment during his testimony that he observed a weapon in Cameron's hands before the shooting. 

[Note 8] We analyze the sufficiency of the evidence as to the murder indictment. The Commonwealth concedes that if the evidence is insufficient to prove that charge, it also would be insufficient to support the remaining convictions. 

[Note 9] The decision in Baxter issued after the parties here filed their briefs, but before oral argument. Both parties argued the import of the decision at oral argument. 

[Note 10] The parties dispute whether evidence was presented that another vehicle was stopped in front of the Audi at the traffic light such that the Audi was "boxed in" by the Honda. The question is immaterial to our analysis. Whether the Audi was boxed in at the traffic light, the positioning of the Honda was sufficient to support a reasonable inference that the defendant shared the passengers' intent to commit an assault against the passengers of the Audi, and the question does not bear on the shared intent concerning the severity (or, more precisely, lethality) of the assault. 

[Note 11] "FaceTime is a type of 'face-to-face video technology'" (citation omitted). Noelle N. v. Frasier F., 97 Mass. App. Ct. 660, 662 n.3 (2020). 

[Note 12] In the first instance, the judge indicated that he would "take care to make sure that someone's decision not to talk to the police is not offered as evidence of his guilt in this case." 

[Note 13] The prosecutor also elicited from the defendant, on cross-examination, that he responded to Detective John Callahan in the negative during his interview when asked if he had called 911 to report the alleged shooting, and commented on four occasions during closing argument on the fact that the defendant did not call 911 to report his claim to have been the victim of a shooting. The defendant did not object on any of those occasions, and we accordingly consider whether they gave rise to a substantial risk of a miscarriage of justice. See Commonwealth v. Irwin, 72 Mass. App. Ct. 643, 654 (2008). 

[Note 14] The trial judge offered the following observation during a sidebar conference concerning the prosecutor's question to the defendant's mother about whether the defendant had filed a police report: 

"Your son calls and tells you, I've been shot at. Now, in the real world in this neighborhood, we know it's probably unlikely that somebody would go, even if they were shot at, and file a police report, especially if they, probably more so if they knew who shot at them."

[Note 15] We note that police arrived at the defendant's mother's home, where the defendant and the Honda were found, within a short time following the shooting. 

[Note 16] The defendant had little choice but to do so, as his account was demonstrably incompatible with a mountain of video surveillance and forensic evidence. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.