NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-139

COMMONWEALTH

vs.

KEVIN AQUINO.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a jury trial in the Superior Court, the defendant was convicted of assault and battery by means of a dangerous weapon (shod foot), causing serious bodily injury, G. L. c. 265, § 15A (c) (i).  On appeal, the defendant claims error in the denials of his motion to suppress and motions for a required finding of not guilty.  The defendant also contends that the prosecutor's cross-examination concerning the defendant's prearrest silence, and comments made by the prosecutor during closing argument on the same, deprived him of a fair trial.  We affirm.

Discussion.  1.  Motion to suppress statements.  a.  Facts. We summarize the facts as found by the motion judge, supplemented with the uncontroverted testimony of the sole witness at the suppression hearing, Detective Jason Gangi of the

New Bedford police, whose testimony the judge explicitly or implicitly credited, and with the documentary evidence admitted at the hearing.  See Commonwealth v. Tremblay, 480 Mass. 645, 654-655 (2018).

Shortly after midnight on June 2, 2019, the New Bedford police responded to a report of a male victim who had been beaten unconscious near Acushnet Avenue.  A surveillance video recording from a nearby residence captured the assault.  Detective Gangi testified that the recording showed a vehicle parked in the back parking lot of a building.  Moments later, two men stepped out of the back seat of the vehicle and attacked the victim.  Next, the driver, later identified as the defendant, and the front passenger stepped out of the vehicle and approached the beating in progress.  The front passenger joined in the assault; the defendant did not.  The defendant did, however, place a hat over the victim's face following the attack.  The four men then returned to the vehicle and drove away.  Police tracked the vehicle by reviewing surveillance video footage retrieved from the area.  From this footage police learned that the vehicle was a dark Nissan Altima, and that the vehicle's driver's side headlight was out.  Police also obtained

2

the vehicle's registration number from a license plate reader[1] in the area, which listed the defendant as the registered owner.

A few days later, police observed the Nissan parked on a street near the defendant's residence. The vehicle was towed and secured at a local New Bedford police station, known as "station three," pending a search warrant. That afternoon, the defendant and a companion arrived at station three and asked about his missing vehicle. Detective Gangi was notified and traveled to station three to speak with the defendant. When he arrived, he met the defendant in the lobby and asked him if he would accompany him and another detective to police headquarters to discuss his vehicle. The defendant agreed, and the three traveled to headquarters in an unmarked cruiser with no barrier between the front seat and rear passenger seat. Consistent with his general practice, Detective Gangi pat frisked the defendant before having him sit in the back of the cruiser.

After a short drive, the three arrived at police headquarters and Detective Gangi and his partner escorted the defendant through a side entrance of the building to an interview room. The detectives were dressed in plain clothes, with their guns and badges visible. The defendant entered the

---

[1] "Automatic license plate readers are cameras combined with software that allows them to identify and 'read' license plates on passing vehicles." Commonwealth v. McCarthy, 484 Mass. 493, 494 (2020).

interview room and sat down in a chair.  He was not restrained in any way.  The detectives gave the defendant a cup of water and left him alone for several minutes.

When the detectives returned, Detective Gangi thanked the defendant for "coming down on [his] own time" and "[o]n [his] own free will" to speak with them and advised the defendant that they were investigating an incident that occurred Saturday night into Sunday morning.  Detective Gangi asked the defendant where he was around that time.  The defendant responded that he was out drinking.  Detective Gangi then asked if the defendant had his vehicle that evening, to which the defendant stated that he did.  The defendant also acknowledged that his vehicle's driver's side headlight was not functioning.

In response to further questioning about his whereabouts, the defendant stated that he was at the Whiskey Lounge bar and that he had left sometime between 11 P.M. and midnight.  The defendant was with three others; he stated that the only stop they made after leaving the bar was to get food near Dean Street and Coffin Avenue.  In response, Detective Gangi advised the defendant that "in that stretch, there's a lot of video," and that he knew "exactly where [the defendant was]" and "what went on."  After the defendant denied that he had stopped anywhere else, Detective Gangi told the defendant that he knew that the defendant was not telling the truth and that he was going to

4

give him a couple of minutes "to think about what [he was] saying," as the detectives were investigating "a serious incident." He then left the room.

A few minutes later, Detective Gangi returned and provided the defendant with Miranda warnings. After inquiring about the nature of the police's investigation and his alleged involvement, the defendant stated that he wanted an attorney. Questioning then stopped and the detectives placed the defendant under arrest.

The motion judge's findings on the tone and tenor of the interview, with which we concur, see Tremblay, 480 Mass. at 656-657, were as follows:

> "Throughout the entire interview, the police were calm and polite toward the defendant. The questioning was not aggressive. They did not raise their voices. They did not pressure or trick the defendant. The tone was conversational. The defendant was able to and did ask questions. Even when Det. Gangi told the defendant that the investigation involved a serious matter and that they knew he was lying, Det. Gangi was respectful. Det. Gangi did not threaten the defendant in any way. He merely suggested that the defendant take some time to think about what he was saying. He told the defendant repeatedly that he did not have to talk to the police. When the defendant invoked his right to counsel, the police immediately respected that decision and terminated questioning."

b. Analysis. The defendant argues that the motion judge erred in denying his motion to suppress statements he made to the police. He contends that he was subject to a custodial

5

interrogation and thus the absence of Miranda warnings required his statements to be suppressed.

"In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error, but conduct an independent review of [the judge's] ultimate findings and conclusions of law." Commonwealth v. Vasquez, 482 Mass. 850, 857 (2019), quoting Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015). We give due deference to the judge's findings regarding the weight and credibility of witness testimony, see Vasquez, supra, but otherwise conduct an independent review of the documentary evidence, see Tremblay, 480 Mass. at 654-655. Because the defendant's motion was made prior to trial, we review its denial for harmless error. Commonwealth v. Chalue, 486 Mass. 847, 881 (2021).

It is well settled that the safeguards of Miranda only apply when a defendant is subject to custodial interrogation. See Commonwealth v. Larkin, 429 Mass. 426, 432 (1999). "An interview is custodial where 'a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive'" (citation omitted). Commonwealth v. Amaral, 482 Mass. 496, 500-501 (2019). To determine whether the defendant was in custody, we consider:

> "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that the person is a suspect; (3) the

nature of the interrogation, including whether the interview was aggressive, or, instead, informal . . .; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."

Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001). "A single factor rarely is determinative." Commonwealth v. Cawthron, 479 Mass. 612, 623 (2018).

Here, the defendant voluntarily traveled with the detectives to police headquarters to be interviewed.[2] See Commonwealth v. Rosa-Roman, 485 Mass. 617, 624-625 (2020), and cases cited ("a defendant arriving voluntarily at a police station would suggest that an interrogation there is noncustodial"). Although the defendant was pat frisked before entering the unmarked cruiser, he was not restrained in any way, and the cruiser had no barrier between the front and rear seats. See Commonwealth v. Molina, 467 Mass. 65, 66-67 (2014) (defendant not in custody when officers asked if defendant would go to police station to answer questions, he rode in police cruiser to police station, and he was not handcuffed or under arrest). The interview was less than ten minutes in duration. At no point did the detectives reveal what crime was under

_____

[2] That the detectives used the defendant's car as a means to get him to come to headquarters for questioning is not material to our custody analysis. See Commonwealth v. Burbine, 74 Mass. App. Ct. 148, 149-152 (2009).

7

investigation, nor did they convey to the defendant that he was a suspect.[3]  Further, the bulk of Detective Gangi's questions were investigatory rather than accusatory.  See Commonwealth v. Vellucci, 98 Mass. App. Ct. 274, 279 (2020).  The detectives were calm, did not raise their voices, and the tone was conversational throughout.  Even when Detective Gangi told the defendant that he knew the defendant was not being truthful, he did so in a cordial manner.  Cf. Molina, 467 Mass. at 74-75 (officer stood "almost over" defendant and "his tone was far more argumentative and aggressive than the one he had previously used").  We conclude that a reasonable person in the defendant's position would not have experienced the environment as coercive and therefore the defendant was not in custody and Miranda warnings were not required.  The defendant's motion to suppress was properly denied.

2.  Motions for required finding of not guilty.  The defendant next contends that the evidence presented at trial was insufficient to prove that he engaged in a joint venture to assault and batter the victim.  In reviewing the denial of the defendant's motions for required findings of not guilty, we

---

[3] The defendant argues that any reasonable person in the defendant's shoes would have known they were a suspect.  Even assuming that is true, it is not dispositive.  See Commonwealth v. Welch, 487 Mass. 425, 436-437 (2021), and cases cited ("Although the defendant . . . believed he was a suspect, officers did not communicate this to him at the time").

consider whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), quoting Jackson v. Virginia, 443 U.S. 307, 318-319 (1979).

"To support a conviction on a theory of joint venture liability, it was the Commonwealth's burden to show that the defendant (a) participated in the commission of the crime charged, (b) did so knowingly, and (c) shared the required criminal intent" (quotations and citation omitted).  Commonwealth v. Sanders, 101 Mass. App. Ct. 503, 508 (2022).  A fact finder is permitted to "infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense" (citation omitted).  Commonwealth v. Lendon, 35 Mass. App. Ct. 926, 927 (1993).  "'[T]here is no need to prove an anticipatory compact between the parties to establish joint venture' if, 'at the climactic moment the parties consciously acted together in carrying out the criminal endeavor'" (citations omitted).  Commonwealth v. Sexton, 425 Mass. 146, 152 (1997).

Here, the Commonwealth presented at trial, among other evidence, the surveillance video recording of the assault.  The footage showed the defendant drive the three assailants to and

9

from the scene of the assault. The defendant parked his vehicle in the entrance of a back parking lot and shut off the lights. Once the victim passed by, two of the assailants stepped out of the vehicle, confronted him, and attacked him. Moments later, the defendant and front seat passenger also stepped out of the vehicle and jogged over to the scene, while leaving the vehicle's front doors open. While the defendant is correct that he never joined in the assault, once the attack ended, he placed the victim's cap over his facial injuries while he lay motionless on the ground. The defendant then ran back to the vehicle and drove himself, along with the three assailants, away from the scene. Three days later, the defendant lied to detectives about his whereabouts around the time of the assault. See Commonwealth v. Jones, 477 Mass. 307, 317 (2017) (lying to police about whereabouts at time of murder is evidence of consciousness of guilt). Contrary to the defendant's assertion, from this evidence the jury could readily infer that the defendant was present at the scene and ready, able, and willing to assist in the commission of the crime, whether that be in the attack of the victim or in escaping from the scene. See Commonwealth v. Simpkins, 470 Mass. 458, 462 (2015) (knowing participation in crime may "take[] the form of agreeing to stand by at, or near, the scene of the crime to act as a lookout, or to provide aid or assistance in committing the crime, or in

escaping, if such help becomes necessary" [citation omitted]).

See also Commonwealth v. Chhim, 447 Mass. 370, 378-379 (2006)

("The jury could have inferred from the fact that the defendant

remained at the scene during th[e] brutal beating that he kept

himself in a position ready and able to help the other attackers

. . . [and] that [he] was willing and available to assist in the

getaway of the joint venturers after the beating ended").  It

follows that there was sufficient evidence for the jury to

reasonably conclude that the defendant knowingly participated in

and shared the requisite intent to commit the crime of which he

was convicted,[4] assault and battery by means of a dangerous

weapon, causing serious bodily injury.[5]  The defendant's motions

for required findings of not guilty were properly denied.[6]

---

[4] The defendant argues that his actions of rushing back to his vehicle and driving away is just as indicative of panic of an individual unknowingly involved in an assault as it is of consciousness of guilt.  "To support a joint venture conviction, [however,] 'the inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable'" (citation omitted).  Commonwealth v. Stokes, 440 Mass. 741, 745 (2004).

[5] There is no dispute whether there was sufficient evidence to satisfy the underlying elements of assault and battery by means of a dangerous weapon, causing serious bodily injury.  See Commonwealth v. Brule, 98 Mass. App. Ct. 89, 93-94 (2020).

[6] We have also considered "the state of the evidence at the close of all the evidence, to determine whether the Commonwealth's position as to proof deteriorated after it closed its case" (citation omitted).  Commonwealth v. Alden, 93 Mass. App. Ct. 438, 445 (2018), cert. denied, 139 S. Ct. 2010 (2019).  The only witness for the defense was the defendant.  Because "the jury were free to disbelieve the defendant's account, there was nothing compelling in this evidence which caused the

3.  Prosecutorial misconduct.  Finally, the defendant argues that the prosecutor improperly cross-examined him about his prearrest silence, and commented on the same during closing argument.  Because the defendant did not object to the prosecutor's questions during cross-examination,[7] or the prosecutor's closing argument, we review for error amounting to a substantial risk of a miscarriage of justice.  See Commonwealth v. McGann, 484 Mass. 312, 322 (2020).

On direct examination, the defendant testified that he placed a hat over the victim's face because he "felt bad" and "got scared."  He explained that he was "scared . . . [he] was going to get hurt with the people that did the attack.  [He] didn't know if . . . they were going to try to . . . hurt [him] at the time."  The defendant further testified that he did not call 911 because "[he] was with the people that did this, and [he] was in fear for [his] life, and [his] family."  The defendant now argues that the prosecutor's questioning during cross-examination on his prearrest silence went beyond a fair response to his direct examination, and should have been limited to his alleged fear.

---

prosecution's case to deteriorate."  Id. at 445-446, quoting Commonwealth v. Walker, 401 Mass. 338, 343-344 (1987).

[7] Defense counsel did successfully object to the form of some of the prosecutor's questions.  However, as the defendant appears to concede, these objections did not preserve the issue now argued on appeal.

"In general, impeachment of a defendant with the fact of his prearrest silence should be approached with caution, and, wherever it is undertaken, it should be prefaced by a proper demonstration that it was 'natural' to expect the defendant to speak in the circumstances." Commonwealth v. Nickerson, 386 Mass. 54, 62 (1982). Assuming we agree with the defendant that it would not have been "natural" to expect him to report the assault to police in these circumstances, and thus some of the prosecutor's questions during cross-examination and comments during closing were improper, we discern no substantial risk of a miscarriage of justice.

Here, the defendant's prearrest silence was brought to the jury's attention by the defendant. On cross-examination, the prosecutor asked the defendant several questions regarding his failure to report what happened. Each question was followed by an objection from defense counsel, which was sustained as to form. Again, even assuming error, we conclude that these questions were "not likely to influence, or even to seize the attention of the jury" (citation omitted). Commonwealth v. Johnson, 32 Mass. App. Ct. 989, 992 (1992).

The prosecutor later elicited testimony from the defendant confirming that he did not call 911, or in any way report the crime, on the night of the assault, during the three days thereafter, or when he arrived at station three to inquire about

13

his vehicle.  The prosecutor's questions on this point were brief, however, and they did not detract from the defendant's defense at trial -- i.e., that he was scared to report the three assailants he was with to the police.  Had the jury credited the defendant's account, "the jury could well have viewed the defendant's failure to [report the crime to] police to have been the product of fear" of retaliation from the assailants. Sanders, 101 Mass. App. Ct. at 514.

We also conclude that the prosecutor's challenged comments during closing do not warrant reversal.  The prosecutor was entitled to respond to the defendant's claim that he was scared for his life.  See Commonwealth v. Fernandes, 478 Mass. 725, 741 (2018) (prosecutor entitled to respond to defendant's argument and point out weaknesses in defendant's case).  In short, we discern no impropriety in the prosecutor's closing argument.[8] And, as argued by the Commonwealth, even assuming error, the

---

[8] The defendant also argues that the prosecutor's comments during closing argument referencing the victim "still laying on the ground waiting for some assistance" as the defendant drove by, followed by a remark stating that the defendant only cared about his missing car, improperly disparaged the defendant's testimony and was an appeal to the jury's sympathy.  See Commonwealth v. McLeod, 30 Mass. App. Ct. 536, 538-539 (1991).  We disagree, and conclude that the prosecutor's remarks fall within the scope of proper argument in the circumstances of this case.  The lack of an objection during the prosecutor's closing remarks is "some indication that the tone, manner, and substance" of the argument were not unfairly prejudicial.  Commonwealth v. Toro, 395 Mass. 354, 360 (1985).

14

prosecutor's challenged comments would not have materially influenced the jury's verdict given the evidence presented.  See Commonwealth v. Alphas, 430 Mass. 8, 13 (1999).  Moreover, the judge properly instructed the jury that closing arguments of counsel are not evidence, and on the limitations of consciousness of guilt evidence.[9]

Conclusion.  We discern no error, either individual or cumulative, giving rise to prejudice or a substantial risk of a miscarriage of justice.

Judgment affirmed.

By the Court (Sullivan, Desmond & Singh, JJ.[10]),

*Joseph F. Stanton*

Clerk

Entered:  May 12, 2023.

---

[9] The defendant did not request an instruction advising the jury that they should not consider his prearrest silence for purposes of impeachment unless they found that the defendant naturally should have spoken in the circumstances.  See Nickerson, 386 Mass. at 62.

[10] The panelists are listed in order of seniority.