NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-131

COMMONWEALTH

vs.

JOEL MONEGRO.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant, Joel Monegro, was indicted for murder in connection with the stabbing death of his wife, Yesenia Torres. Following a jury trial in the Superior Court, the defendant was found guilty of voluntary manslaughter.  The defendant now appeals his conviction, maintaining that (1) the trial judge erred by determining that Torres's statement, "he stabbed me," qualified as a dying declaration; (2) it was improper for the Commonwealth to refer to the defendant's testimony as "a demented jigsaw puzzle put together with half-truths and out and out lies" during closing arguments; and (3) the judge erroneously allowed the Commonwealth to introduce inflammatory crime scene and autopsy photographs into evidence.  We affirm.

Background.  We recite the facts as the jury could have found them, reserving certain details for later discussion.  The defendant and Torres were married and had three children.  In 2016, Torres learned that the defendant was having an extramarital affair with another woman and that he had a child with her.  In April 2018, the other woman again became pregnant by the defendant, prompting Torres to end her relationship with him.  Torres and the defendant agreed that she and their children would live in their apartment and the defendant would give her money each month for rent.

In May 2018, the defendant met Torres at the apartment to give her rent money.  Shortly after the defendant arrived at the apartment, he and Torres engaged in a physical altercation involving two knives, and both parties received multiple stab wounds.  At trial, the prosecution and defense disputed who started the altercation.  After the struggle ended, the defendant made several phone calls.  First, he returned a call from his upstairs neighbor and stated, "call 911.  We are dying over here.  We got into a fight and stabbed each other."  The defendant then made two calls to the Lawrence Police Department.  Recordings of these calls were admitted in evidence and played for the jury.  In one call, the defendant said, "We almost stabbed to death, we are stabbed to death . . . if you don't hurry up, we are both going to die"; "come quick we don't have

2

much time"; and "hurry up, we're going to die . . . my wife and me, we're both gonna die . . . we both stabbing each other to death."  In the other call, the defendant can be heard calling Torres's name and yelling, "come now, she's gonna die, please, hurry up, please, if you don't hurry up, she's gonna die . . . we both stabbed each other to death."

When first responders arrived on scene, they found the defendant and Torres lying face down on the kitchen floor together, bleeding.  One officer recorded the scene with his cell phone and asked Torres what had happened.[1]  In response, Torres gestured towards the defendant and said, "he stabbed me." Torres died a short while later.

Discussion.  1.  Dying declaration.  On appeal, the defendant challenges the judge's conclusion that Torres's statement to first responders that "he stabbed me" qualified as a dying declaration.  Specifically, he asserts that the Commonwealth did not present sufficient evidence to prove that Torres believed that her death was imminent.  We disagree.

"In homicide prosecutions in Massachusetts, a victim's out-of-court statement may qualify as a dying declaration if the 'statement [is] made . . . under the belief of imminent death

_____

[1] The recording inadvertently stopped after twenty-one seconds.  Torres's response is not recorded on this video, but the officer testified about the response at trial.

3

and [the declarant] died shortly after making the statement, concerning the cause or circumstances of what the declarant believed to be the declarant's own impending death or that of a co-victim.'" Commonwealth v. Middlemiss, 465 Mass. 627, 632 (2013), quoting Mass. G. Evid. § 804(b)(2) (2013). Before admitting a statement into evidence as a dying declaration, the trial judge must first determine by a preponderance of the evidence that the victim believed he or she was going to die imminently. Commonwealth v. Nesbitt, 452 Mass. 236, 251 n.16 (2008), quoting Commonwealth v. Key, 381 Mass. 19, 22 (1980). This belief "may be inferred from the nature of the victim's injury and the victim's conduct," Commonwealth v. Moses, 436 Mass. 598, 602 (2002), and does not require an explicit statement from the victim. Key, supra at 24.

Torres suffered multiple wounds to her face, neck, torso, and hands, the most serious of which included a stab wound to the side of her torso that was four and one-half centimeters long and five centimeters deep, and a "gaping incised wound" to her left bicep that measured fifteen centimeters long and three centimeters deep. Torres was bleeding so heavily from her wounds that one first responder "suspected an arterial bleed." There was also ample evidence to support an inference that Torres was conscious and near enough to the defendant for her to overhear his panicked statements on the phone about her

4

impending demise, including, "we are stabbed to death," "we are both going to die," and "come now, please, she's gonna die." When first responders arrived, the two of them were found lying directly next to each other with the defendant's phone on the floor near their heads, and Torres can be heard moaning on the 911 recordings.[2]  It would also be permissible to infer that Torres was aware enough to understand the defendant's statements because, although she was "semiconscious" when officers arrived, she was able to answer the officer's question about what had happened.  In these circumstances, we see no error in the judge's determination that the Commonwealth proved by a preponderance of the evidence that Torres believed she was going to die.

2.  Closing arguments.  During closing arguments, the prosecutor stated that the defendant's testimony was "a demented jigsaw puzzle put together with half truths and out and out lies, attempting to match it to physical evidence except when it can't."  The defendant asserts that this statement was an impermissible expression of the prosecutor's own personal belief about the defendant's credibility.  There was no objection to

---

[2] The neighbor also testified that while he was talking to the defendant over the phone, he heard Torres "moan" and she "didn't sound distant."  On the recording of the defendant's 911 call, officers can be heard entering the house; these officers testified that the defendant and Torres were lying next to each other when they arrived.

this statement at trial; we therefore assess whether the "argument [was] improper and, if so, whether [it] created a substantial risk of a miscarriage of justice [quotation omitted]." Commonwealth v. Sanders, 101 Mass. App. Ct. 503, 511 (2022).

"Prosecutors may 'argue forcefully for the defendant's conviction.'" Commonwealth v. Martinez, 476 Mass. 186, 199 (2017), quoting Commonwealth v. Wilson, 427 Mass. 336, 350 (1998). "The jury are presumed to understand that a prosecutor is an advocate, and statements that are '[e]nthusiastic rhetoric, strong advocacy, and excusable hyperbole' will not require reversal." Martinez, supra, quoting Wilson, supra at 351. A prosecutor may not, however, "express[] a personal belief in the credibility of a witness, or indicate[] that he or she has knowledge independent of the evidence before the jury." Martinez, supra, quoting Wilson, supra at 352. We view the remark "in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." Commonwealth v. Kolenovic, 478 Mass. 189, 199 (2017), quoting Commonwealth v. Gaynor, 443 Mass. 245, 273 (2005).

The challenged remark introduced the portion of the prosecutor's argument in which she contrasted the defendant's testimony with the evidence and argued that the jury should not believe the defendant. Commonwealth v. Ortega, 441 Mass. 170,

6

181 (2004).  Although the statement limned the border of acceptable rhetoric and would better have been left unsaid, we conclude that it did not cross the line.  See Commonwealth v. Yesilciman, 406 Mass. 736, 746 (1990) ("A certain measure of jury sophistication in sorting out excessive claims on both sides may fairly be assumed" [quotation omitted]); Sanders, 101 Mass. App. Ct. at 511 (closing referred to defendant as a "liar" and characterized defense as "garbage"; in the circumstances, no substantial risk of miscarriage of justice).  Context assists us in this analysis; the judge instructed the jury on three separate occasions that closing arguments are not evidence.  In reviewing this statement, we presume that the jury understood and followed these instructions.  Commonwealth v. Hernandez, 473 Mass. 379, 392 (2015).  Under this standard, and considering the overwhelming evidence against the defendant, we are not persuaded that the statement constituted reversible error.[3]  See Commonwealth v. Carter, 475 Mass. 512, 522 (2016) ("Even if there had been an appearance of impropriety in the statements, the judge carefully and clearly instructed the jury that closing

_____

[3] The fact that the jury returned a verdict for voluntary manslaughter, not first degree murder, indicates that the jury followed the judge's instructions and questioned the Commonwealth's theory of the case.  See Commonwealth v. Bois, 476 Mass. 15, 35-36 (2016) ("it is clear that the jury did not blindly accept the prosecutor's arguments, as they rejected the Commonwealth's theory that the defendant had committed the killing with deliberate premeditation").

arguments are not evidence and that they alone were tasked with determining credibility").

3.  Photographic evidence.  Finally, the judge did not abuse his discretion in allowing the Commonwealth to introduce two autopsy photographs and multiple photographs of the crime scene into evidence.  "Relevant evidence is admissible as long as the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."  Commonwealth v. Wall, 469 Mass. 652, 661 (2014).  "Whether evidence is relevant in any particular instance, and whether the probative value of relevant evidence is outweighed by its prejudicial effect, are questions within the sound discretion of the judge."  Id. (quotation omitted).  We will not disturb a judge's determination that photographs are relevant and admissible unless the "defendant is able to bear the heavy burden of demonstrating an abuse of that discretion."  Commonwealth v. Benson, 419 Mass. 114, 118 (1994), quoting Commonwealth v. Waters, 399 Mass. 708, 715 (1987).

The judge properly allowed two autopsy photographs of the victim's hands into evidence.  In weighing the probative value of these photographs, the judge noted that

> "the significance or potential significance of the fingernails [shown in the photographs] is obvious.  There is a struggle, even by the defendant's version, where they were stabbing each other.  Therefore, this is an altercation, and the damaged fingernails are relevant

8

potentially to the issues of who is the first aggressor, self-defense . . . [and] the amount of force that was used."

The judge also concluded, and we agree, that any potential prejudice was mitigated by the fact that the autopsy photos were not overly graphic; they showed only the victim's hands and not the rest of her body. See Commonwealth v. Obershaw, 435 Mass. 794, 803-804 (2002) (photographs admissible where "[n]one of the photographs taken in the autopsy room showed the body in an altered state"). We agree with the judge's reasoning and conclude that there was no error in admitting the two autopsy photographs.[4]

The judge also did not abuse his discretion by allowing the Commonwealth to introduce thirty-two photographs of the bloody crime scene into evidence. "That the photographs may be gruesome or have an inflammatory effect on the jury does not render them inadmissible so long as they possess evidentiary value on a material matter." Commonwealth v. Olsen, 452 Mass. 284, 294 (2008). They did. The crime scene photographs depicted the location and amount of blood evidence in various areas of the apartment, which was relevant to three central

---

[4] Although the Commonwealth initially represented that it would not introduce any autopsy photos into evidence, trials are fluid, and it was within the judge's discretion to revisit this issue in light of the other trial evidence and the defendant's trial strategy. See Commonwealth v. Gonzalez, 22 Mass. App. Ct. 274, 277 n.5 (1986).

issues:  (1) malice; (2) extreme atrocity or cruelty; and (3) whether the defendant acted in self-defense.[5]  Moreover, the probative value of these photographs was not outweighed by any potential prejudice to the defendant.  As the trial judge noted, the photographs were not unnecessarily repetitive because each photograph "depicted different views [of the crime scene]."  See Commonwealth v. Alleyne, 474 Mass. 771, 780-781 (2016) (no abuse of discretion in admitting autopsy photographs where each photograph "was probative of a point that the others were not").  Any potential prejudice was also mitigated by the judge's contemporaneous instruction to the jury that they should not be swayed by any sympathy that might be evoked by the photographs.[6]

---

[5] The number of photographs does not change this analysis.

[6] We find no merit in the defendant's contention that the photographs prejudiced him because they depicted his own blood, as well as Torres's blood, so that the apartment looked "twice as bloody."  The defendant himself relied on the bloody nature of the scene to support his theory of self-defense.  He was not prejudiced by the fact that his blood was also depicted in the photographs.

See Commonwealth v. DeSouza, 428 Mass. 667, 670 (1999).  There was no abuse of discretion.

Judgment affirmed.

By the Court (Green, C.J.,
  Desmond & Hershfang, JJ.[7]),

Clerk

Entered:  July 30, 2024.

---

[7] The panelists are listed in order of seniority.